In The Matter of ALLIED SUPERMAR-
KETS, INC., a Delaware
Corporation, Debtor.

BORMAN'S, INC., and Chatham
Supermarkets, Inc., Intervenor,

v.

ALLIED SUPERMARKETS, INC., a
Delaware Corporation, Debtor.

Bankruptcy No. 8–92871–H.
Civ. A. No. 9–72019.

United States District Court,
E. D. Michigan, S. D.

Sept. 3, 1980.

Eugene Driker, Detroit, Mich., Wallace M. Handler, Southfield, Mich., for intervenor.

Sheldon S. Toll, A. David Mikesell, Barbara Rom, Detroit, Mich., Irving A. August, Birmingham, Mich., for debtor.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

This is an appeal under 11 U.S.C. § 67[1] from a decision of a bankruptcy judge filed on behalf of two corporations engaged in the operation of supermarkets in the metropolitan Detroit area, Borman's Inc. (Borman's) and Chatham Supermarkets, Inc. (Chatham).

On November 6, 1978, Allied Supermarkets, Inc. (Allied), a competitor of Borman's and Chatham, filed a petition for arrangement under Chapter XI of the Bankruptcy Act. During the pendency of the proceedings in the Bankruptcy Court, Allied was authorized as debtor–in–possession to continue the operation of its business and management of its property.

During the course of the proceedings, Allied prepared and submitted to the Bankruptcy Court for its approval a comprehensive "Business Plan", a proposal containing various elements relating to a restructuring of the business in order to augment its chances for survival and ultimately successful arrangement under Chapter XI. One of the principal elements of the plan, and the cause of this dispute, concerned the rejection of executory labor contracts and renegotiations with the affected employees through the collective bargaining process. The Business Plan was approved by the Creditors Committee (an elected oversight group of the approximately 10,000 unsecured creditors whose aggregate claims exceed seventy–five million dollars).

Prior to the submission of the Plan to the Bankruptcy Court, Allied had also entered into discussions with the affected unions,[2] and received tentative approval of the Business Plan particularly insofar as it pertained to the labor contracts in force. Discussions were also held with the employees and their union representatives for the purpose of explaining the scope and nature of concessions that were considered by Allied to be indispensable to the continuation of the business.

On Friday, March 23, 1979, Allied filed notices that hearings would be conducted the following Monday in the Bankruptcy Court on Allied's application for authority to reject the executory contracts with the three union locals which had considered and approved the concessions. Allied sought this rejection pursuant to Section 313(1) of the Bankruptcy Act, 11 U.S.C. § 713(1).[3] No notice of the scheduled March 26 hearing was given to Borman's or Chatham. However, on that day representatives of

---

1. This citation to Title XI of the United States Code, and all others in this opinion, refer to the statutory numeration prior to the Revised Bankruptcy Act of 1978, 11 U.S.C. § 101, *et seq.* The provisions of the Revised Act do not apply to this case which was commenced prior to the effective date of the new Act. *See* 11 U.S.C. Prec. § 101.

2. The three locals involved, Retail Store Employees Union Local No. 36, Retail Store Employees Union Local 876, and Amalgamated Meat Cutters and Butcher–Workmen of North America Local 539, do not comprise all of Allied's union employees. One other local significantly involved in Allied's Michigan based division was Teamsters Local 337. Counsel for Teamsters Local 337 appeared during the course of the bankruptcy proceedings to advise the Court that Local 337 had not agreed to the proposed concessions and that Local 337 considered its collective bargaining agreement with Allied to be in effect.

3. This section provides:

"Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties conferred and imposed upon it by this chapter—

(1) permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to such other parties in interest as the court may designate;"

Borman's and Chatham appeared before the bankruptcy judge and requested that they be allowed to intervene, claiming that as parties to the collective bargaining contracts in question, their interests would be directly affected if the contracts were rejected. The bankruptcy judge allowed the interventions and after determining that two full days of discovery would be required for preparation by the intervenors, the bankruptcy judge rescheduled the hearings on Allied's application to March 30, 1979.

The Bankruptcy Court heard evidence relevant to Allied's application to reject the collective bargaining agreements on March 30 and March 31. The evidence presented at the hearing indicated that Allied had been incurring serious losses for a number of years in the fiercely competitive supermarket business. Allied's Chief Executive Officer, Earl W. Smith, testified that the corporation's losses in the period following the filing of its petition for arrangement totaled nearly $173,000 per week and that the financial condition of the corporation was so precarious that only the immediate and full implementation of the proposed Business Plan would permit Allied to remain in business. In Smith's view, a viable Business Plan would not be feasible absent the termination of Allied's existing collective bargaining agreements and a renegotiation of those contracts with significant concessions by the employees.

All other interested parties, including the unions, either urged approval of the Plan or raised no objection to it, except for Borman's and Chatham. These two competitors introduced evidence that established that they along with Allied were participants in a multi–employer bargaining unit known as United Supermarket Association and that through that unit a standardized labor agreement had been negotiated. They then contended that the agreement was binding on all those corporations and could not be rejected without the approval of each or, alternatively, that rejection could not receive court sanction unless the interests of each participant was considered and weighed under the strict standard developed in the case law. *See Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.,* 519 F.2d 698 (2nd Cir. 1975); *Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164 (2nd Cir. 1975), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975).

After the taking of testimony, the bankruptcy judge determined that Allied could disaffirm the three collective bargaining agreements. The Bankruptcy Court first noted that in the ordinary case the executory contracts of a debtor may be rejected under § 313(1) of the Bankruptcy Act merely on a showing that the disaffirmance would be advantageous to the debtor. Such a standard, the Bankruptcy Court ruled, does not apply where the contract sought to be rejected is a collective bargaining agreement. Instead, the bankruptcy judge adopted the balancing test prescribed by the *Kevin Steel* and *REA Express* cases, *supra.* Due primarily to Allied's bleak financial outlook absent a rejection of its collective bargaining agreements, the Court concluded that the evidence weighed in favor of the debtor and granted Allied's petition. In so doing, the Bankruptcy Court expressly rejected the arguments of Chatham and Borman's that their status as parties to a multi–employer unit required the Bankruptcy Court to consider their interests before acting under § 313(1). The bankruptcy judge held:

> "The relationship, the contract, call it whatever you may, existing between Borman, Allied, and Chatham is under no stretch of the imagination a labor contract. There is no employer–employee relationship between the two.
>
> It is not the type of collective bargaining agreement that 313 intended to exempt or give special treatment under Section 313."

Transcript, March 31, 1979, p. 5.

Borman's and Chatham have appealed from the ruling of the bankruptcy judge, contending initially that Allied was a member of a multi–employer bargaining unit. This being the case, appellants contend that

the bankruptcy judge was required to "move cautiously in allowing rejection of a collective bargaining agreement". *Kevin Steel, supra* at 707. Specifically Borman's and Chatham claim that, as parties to a collective bargaining agreement, their interests and the interests of their employees should have been taken into account by the bankruptcy judge. Furthermore, appellants assert that the bankruptcy judge misapplied the pertinent legal standard.

Allied disputes the contention that its participation in the United Supermarket Association created a multi–employer unit. However, even if it is determined to be a part of a multi–employer bargaining arrangement, Allied maintains that such a fact is irrelevant since only those labor contracts which directly affect the rights and obligations of an employer vis-a-vis its own employees are subject to the special rules laid out in *Kevin Steel* and *REA Express*.

The threshold question presented to this Court concerns the United Supermarket Association and the claimed existence of a multi–employer bargaining unit. The evidence taken in the proceedings before the bankruptcy judge indicates that for more than twenty years, Allied, Borman's and Chatham have bargained with the Retail Clerks and the Meat Cutters unions through the United Supermarket Association (hereinafter U.S.A.). U.S.A. is not a corporation, nor has it filed under the Michigan assumed name statute; it has no board of directors, no by–laws and it collects no dues. U.S.A. appears to consist of a single labor consultant, Jack Bushkin, who has been U.S.A.'s designated agent for the negotiations of these contracts. Bushkin receives no compensation for his services from U.S.A., rather he is paid for his services by Allied, Borman's and Chatham, respectively and prorata.

The parties also introduced evidence concerning the procedures by which negotiated agreements between the unions and U.S.A. become binding collective bargaining agreements. Typically, at the conclusion of negotiations, a handwritten memorandum setting forth the conditions agreed upon is drafted. This document is then signed by the union, Bushkin and a representative of each of the three corporations. This proposed agreement is then presented to the employees of Allied, Borman's and Chatham, and a ratification vote is taken. Ratification voting is union–wide, without regard to the particular employer. Thus, it is not even known whether, for example, a majority of union members employed by Allied ratified or rejected the proposed agreement.

When ratification is concluded, an agreement indicating U.S.A. to be the employer is executed. Also prepared at this time are identical agreements prepared by the union to be signed by Allied, Borman's and Chatham individually. Following ratification, each company administers the grievance and arbitration provisions of the contract individually.

Under that factual setting, it is necessary to determine whether the three supermarket competitors here constituted a multi–employer bargaining unit and, if so, the respective interests and obligation of the members of the unit relative to this bankruptcy proceeding.

Multi–employer bargaining units are strictly voluntary, consensual organizations. *See Detroit Newspapers Association v. N.L.R.B.*, 372 F.2d 569, 570 (6th Cir. 1967); *N.L.R.B. v. Sklar*, 316 F.2d 145, 150 (6th Cir. 1963). The Sixth Circuit's observations in these two cases stressed the fact that employers may not be compelled to bargain in a multi–employer unit. However, it has been generally and consistently held that regardless of the formalities in its foundation, a multi–employer unit will be found to exist where there is demonstrated an unequivocal intention on the part of the constituent members to be bound by group action. *See McAx Sign Co., Inc. v. N.L.R.B.*, 576 F.2d 62 (5th Cir. 1978), *cert. den.*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Taylor Motors, Inc., et al.*, 241 N.L.R.B. No. 113 (1979).

■ Allied here emphasizes the fact that U.S.A. is not formally tied to Allied, Borman and Chatham and possesses few of the characteristics of a formal organization. Allied points out that there is no written or oral agreement between the three corporations and that U.S.A. has no board of directors or by–laws. These facts, however, are not determinative. As explained by the Board in *York Transfer & Storage Co.*, 107 N.L.R.B. 139 (1953):

"Under Board law, it is not a prerequisite for the establishment of an association–wide or multi–employer unit that there be evidence of an employer association with formal organizational structure, or that the members delegate to the association final authority to bind them, or that the association membership be nonfluctuating. The settled criterion for the inclusion of an employer in a multi–employer bargaining unit is whether the employer unequivocally intends to be bound in collective bargaining by group, rather than individual action. Thus, participation by an employer in group bargaining provides such evidence of the employer's intention." *Id.* at 142 (footnotes omitted).

*See also N.L.R.B. v. Dover Tavern Owners' Association*, 412 F.2d 725 (3rd Cir. 1969); *Falkowski Grocery*, 236 N.L.R.B. 473 (1978); *The Kroger Comp.*, 148 N.L.R.B. 569 (1964).[4]

Thus the overriding consideration is whether Allied, Borman's and Chatham intended to be bound by group bargaining, and as indicated in *York Transfer & Stor-*

*age, supra*, the prior bargaining history is significant in assessing that intent. *See N.L.R.B. v. R. O. Pyle Roofing Co.*, 560 F.2d 1370 (9th Cir. 1977); *Krist Gradis*, 121 N.L.R.B. 601 (1959); *Hi–Way Billboards, Inc.*, 191 N.L.R.B. 244 (1971). The prior bargaining history in the Detroit area supermarket industry supports the contention that the three corporations did intend to be bound by the agreements reached by U.S.A. Allied, Borman's and Chatham had a long history of bargaining as a unit through Bushkin and U.S.A. and there is no evidence in the record that any of the members of U.S.A. did not consider themselves a part of this association. Furthermore, the ratification procedures employed by the three corporations support the view that Allied, Borman's and Chatham were bound by group negotiations. *Bel Window*, 240 N.L.R.B. No. 161 (1979).

■ The testimony adduced in the proceedings before the bankruptcy judge satisfies the Court that Allied, Borman's and Chatham intended to be bound by group negotiations through the U.S.A. The Court therefore concludes that a multi–employer bargaining unit did exist here.[5]

That conclusion, of course, compels the further conclusion that Borman's, Chatham and Allied have mutual rights and obligations. It is not necessary to identify and define the nature and scope of those rights and obligations except insofar as they may relate to this unique context–the obligation by competitors to the rejection in a bankruptcy court of a collective bargaining

---

4. The Board's decision in *Kroger* is particularly apt for two reasons. First, it represents a decision by the Board regarding group employer negotiations without a formal association in the supermarket industry. Second, *Kroger* is also frequently cited for the proposition that a multi–employer bargaining unit may exist even if individual employers bargain separately on special matters. *See N.L.R.B. v. Sheridan Creations, Inc.*, 357 F.2d 245 (2nd Cir. 1966). Allied has cited evidence that each of the three corporations negotiated "side agreements" with various locals. Allied contends that this evidence negates any inference of group bargaining. The Board's opinion in *Kroger* suggests otherwise.

5. One final factor which has been stressed before the Court on the question of the existence of a multi–employer unit is the unions' views of whether U.S.A. was a multi–employer association. Unfortunately, the one local which has addressed this issue has not been completely consistent in its treatment of the status of U.S.A. In the Bankruptcy Court proceeding, Horace Brown, President of the Retail Store Employees Union Local 876, testified that U.S.A. was a multi–employer bargaining unit. However, in pleadings filed on behalf of Local 876 in another case filed in this District, counsel for Local 876 has denied that U.S.A. is a multi–employer unit. *See* Defendant's Answer in *Borman's Inc. v. Retail Store Employees Union, Local 876*, Civ.No. 79–79074 (E.D.Mich.).

agreement to which they are parties. There being no precedent presented to or found by this Court on this precise issue, it seems prudent to analyze and determine the issue by the use of analogy, logic and the application of general principles. The task is not an easy one considering the competing interests and conflicting policies involved. A good starting point, particularly since it describes an approach to these problems, is the experience of the Second Circuit in *Kevin Steel, supra*, and *REA Express, supra.*

Kevin Steel Products, Inc. filed a petition for arrangement under Chapter XI of the Bankruptcy Act in September, 1973. After it was authorized to operate its business as debtor–in–possession, Kevin Steel moved for rejection of its collective bargaining agreement with the union under § 313(1) of the Bankruptcy Act. The bankruptcy judge granted the petition, but this decision was reversed by the District Court which held that the policies of the National Labor Relations Act prevented the disaffirmance of a collective bargaining agreement. *Shopmen's Local No. 455 v. Kevin Steel Products*, 381 F.Supp. 336 (S.D.N.Y.1974).

On appeal the Second Circuit was presented with the apparent inconsistency between the Bankruptcy Act and federal labor law. Kevin Steel argued that the literal language of § 313(1) of the Bankruptcy Act allowed the bankruptcy judge to authorize the rejection of any executory contract, including labor agreements.

The Union and the National Labor Relations Board argued in the Court of Appeals that § 313(1) must be interpreted in light of conflicting statutory provisions. Specifically, it was urged that a literal construction of § 313(1) would conflict with § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), which provides that no party to a collective bargaining agreement may terminate or modify such a contract absent compliance with certain specified procedures.[6] The Union and the Board argued that, because of the peculiar status of a collective bargaining agreement, and due to the general labor law policy of preserving industrial peace, the Labor Act had to be given preeminence in this confrontation with the Bankruptcy Act.

The Second Circuit reviewed the relevant legislative history and existing case law and concluded the District Court erred in holding that collective bargaining agreements could never be disaffirmed in bankruptcy. The Court first ruled that there was no conflict between § 313(1) of the Bankruptcy Act and the N.L.R.A. The Court reasoned that a debtor–in–possession was a "new juridical entity" with its own rights and duties and is no longer a "party" to a collective bargaining agreement under Section 8(d). The Court thus viewed the debtor–in–possession as a successor to the pre–bankruptcy company, and as a successor, was required to bargain with union representatives, but was not bound by the preexisting labor agreement. *See N.L.R.B. v. Burns International Security Service, Inc.*, 406 U.S. 272, 281–291, 92 S.Ct. 1571, 1579–

---

**6.** Section 8(d) provides in pertinent part:

"the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification —

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock–out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later;"

84, 32 L.Ed.2d 61 (1972); *Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). The Court concluded § 313(1) could be the basis for the rejection of a collective bargaining agreement.

The Second Circuit then addressed the standard which should be utilized in rejecting such contracts in light of the policy arguments advanced by the union and the board in favor of continuity in collective bargaining agreements. The Court held that the usual standard for the rejection of ordinary executory contracts, which requires only the finding that disaffirmance would be favorable to the debtor, would not completely protect the interrelated policy interests. The Court therefore adopted language from *In Re Overseas National Airway*, 238 F.Supp. 359, 361–362 (D.C.N.Y.) where it was held that rejection of a collective bargaining agreement should be allowed:

> "only after thorough scrutiny, and a careful balancing of the equities on both sides, for, in relieving a debtor from its obligations under a collective bargaining agreement, it may be depriving the employees affected of their seniority, welfare and pension rights, as well as other valuable benefits which are incapable of forming the basis of a provable claim for money damages. That would leave the employees without compensation for their losses, at the same time enabling the debtor, at the expense of the employees, to consummate what may be a more favorable plan of arrangement with its other creditors." 519 F.2d at 707.

Within weeks after the *Kevin Steel* case, the Second Circuit was again called upon to consider a petition for rejection of a collective bargaining agreement under the Bankruptcy Act in *REA Express, supra.* This case arose out of a corporate debtor's attempt to reject a collective bargaining agreement which was subject to the provisions of the Railway Labor Act (RLA), 45

U.S.C. § 151 *et seq.*[7] The Court reaffirmed the *Kevin Steel* holding that collective bargaining may be rejected by the Bankruptcy Court in the proper circumstances. The *REA Express* Court then further elaborated on the tests to be used by the Court in determining whether disaffirmance was appropriate. The Court stated:

> "where, after careful weighing of all of the factors and equities involved, including the interests sought to be protected by the RLA, a district court concludes that an onerous and burdensome executory collective bargaining agreement will thwart efforts to save a failing carrier in bankruptcy from collapse, the court may under § 313(1) authorize rejection or disaffirmance of the agreement." *Id.* at 169.

The Court also explained the standard in this way:

> "in view of the serious effects which rejection has on the carrier's employees it should be authorized only where it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, the carrier will collapse and the employees will no longer have their jobs."
> *Id.* at 172.

The principles discussed in these two Second Circuit decisions have been addressed by other federal courts in subsequent cases which have generally identified a two part test: (1) Is the labor contract onerous and burdensome? (2) Do the equities involved balance in favor of the debtor? *See Local Joint Executive Board, AFL–CIO v. Hotel Circle*, 419 F.Supp. 778 (S.D.Cal. 1976) *aff'd* 613 F.2d 210 (9th Cir. 1980); *Bohack Corp. v. Truck Delivery Local Union No. 807*, 431 F.Supp. 646 (E.D.N.Y.) *aff'd* 567 F.2d 237 (2nd Cir. 1977), *cert. denied* 439 U.S. 825, 99 S.Ct. 95, 58 L.Ed.2d 117 (1978); *In Re Alan Wood Steel Co.*, 449 F.Supp. 165 (E.D.Pa.1978); *In Re Studio Eight Lighting*, 91 L.R.R.M. 2429 (E.D.N.Y.

---

**7.** Section 2 of the RLA, 45 U.S.C. § 152, seventh, is comparable to § 8(d) of the L.M.R.A., preventing any alterations of the substantive provisions of a collective bargaining agreement except in the manner prescribed in the agreements themselves or in the RLA, *see* 45 U.S.C. § 156.

1976). In each of these cases an interested union had attacked an employer's attempt to reject a collective bargaining agreement in bankruptcy, and in each of these cases the Court adopted the *Kevin Steel* and *REA Express* conclusion that § 313(1) does give the court authority to disaffirm collective bargaining agreements.

The factual setting of the above cases points out the uniqueness of the case at bar. Here, the unions have not objected to Allied's petition to reject its collective bargaining agreements. On the contrary, the union was presented with the labor concessions embodied in Allied's business plan prior to the filing of Allied's petition, and the Business Plan's proposals were approved by a vote of the locals involved. These locals were represented at the proceedings before the Bankruptcy Court on Allied's application for authority to reject its collective bargaining agreement, but the unions interposed no objections to Allied's request. Allied's competitors have, however, challenged Allied's ability to disaffirm these contracts, based on the existence of a multi–employer bargaining agreement.

■ Before proceeding to an analysis of the arguments submitted to the Court, it is important to note an issue which is apparently not in dispute. All of the parties to this appeal have accepted the holdings of the Second Circuit in *Kevin Steel* and *REA Express* to the effect that, in some circumstances, rejection of a labor contract is appropriate. Borman's and Chatham have not reiterated the arguments raised by the union and the board in *Kevin Steel* by claiming that no collective bargaining

agreement may ever be rejected under § 313(1) of the Bankruptcy Act. On the other hand, Allied has not seen fit to argue that the accepted standard for the disaffirmance of executory contracts generally must also govern the rejection of collective bargaining agreements. The parties therefore agree that the holdings of *Kevin Steel* and *REA Express* are correct, and the Court joins the parties in this conclusion.[8] The parties do, however, disagree completely on the application of the *Kevin Steel* and *REA Express* standards to the unique fact situation presented here.

In appellants' view, the Bankruptcy Court misperceived the tests laid out in the Second Circuit opinions. Borman's and Chatham assert that negotiated wage terms may be disaffirmed only if they are "*unusually* high, onerous and burdensome." *In Re Studio Lighting Co., supra*. This, they argue, is not the case here since Allied, Borman's and Chatham were parties to a unitary collective bargaining arrangement. Appellants' perception of the equities which the bankruptcy judge was charged to weigh under *Kevin Steel* and *REA Express* also differs significantly from that of Allied. They contend that the bankruptcy judge was required to consider the effects of Allied's disaffirmance on Borman's and Chatham–the other two parties to the collective bargaining agreement. Thus appellants' attack as erroneous the bankruptcy judge's failure to consider the interests of appellants and their employees, and his decision, based on his allegedly incorrect view of the equities to be weighed, to exclude certain

8. This is not meant to suggest that the Second Circuit's decisions in *Kevin Steel* and *REA Express* have completely escaped criticism. Such is not the case, particularly with regard to the Court of Appeal's attempt to resolve the apparent conflict between the Bankruptcy Act and the N.L.R.A., based on the conclusion that the debtor–in--possession constitutes a new juridical entity. *See, e. g.*, Note 51 N.D.L.Rev. 819, 829 (1936); Note 22 Wayne L.Rev. 165, 172 (1975); *see also* Comment, "Collective Bargaining and Bankruptcy," 42 S.Cal.L.Rev. 477 (1969). This criticism is perhaps best borne out by the fact that the Second Circuit has

since recognized that its "new juridical entity" theory does not easily translate in other areas of bankruptcy law. The Second Circuit has, in fact, found it necessary to confine the application of that theory to the precise fact situation presented in *Kevin Steel* and *REA Express*. *See In the Matter of Unishops*, 543 F.2d 1017, 1018–1019 (2nd Cir. 1976); *Truck Drivers Local Union No. 807 v. The Bohack Corp.*, 541 F.2d 312, 319 (2nd Cir. 1976). Nevertheless, the Court is persuaded by the carefully considered opinions in *Kevin Steel* and *REA Express* as to the accommodation of the competing statutory interests involved.

evidence which appellants consider relevant.[9]

The initial question which the Court must address concerns the application of *Kevin Steel* and *REA Express* to the facts of this case. As noted above, once the Second Circuit in *Kevin Steel* had determined that collective bargaining agreements could be rejected under § 313(1), the Court then turned to the standard for rejection which should be employed. The Court cautioned that a more careful scrutiny of the application for rejection was in order in these cases because the traditional standard for rejection of a non–labor contract "totally ignores the policies of the Labor Act and makes no attempt to accommodate them". *Id.* at 707. These broad policies underlying the Labor Act and their application to the instant case provide an appropriate starting point for the Court's discussion.

The United States Supreme Court has noted that multi–employer bargaining is "a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining." *N.L.R.B. v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 95, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957). It has therefore been held that, to achieve these policy goals, an employer who is part of a multi–employer bargaining unit is bound by the terms of the negotiated contract. *Universal Insulation Corporation v. N.L.R.B.*, 361 F.2d 406, 408 (6th Cir. 1966). These cases suggest that the same policies favoring labor peace which compelled the Second Circuit to adopt a stricter standard for the rejection in bankruptcy of employer/employee collective bargaining agreements, mandate that a similar approach be used in cases such as the one at bar. Nevertheless, this Court is reluctant to apply the stricter standard for

rejection found in *Kevin Steel* and *REA Express* merely on the basis of appellants' arguments that, like Second Circuit cases, this one involves a labor contract.

■ The Court is particularly concerned that the important policies of the Labor Act which persuaded the Second Circuit to forge its stricter standard, may not be as serious a consideration in the instant case. It is of course true that the paramount goal of the Labor Act is to preserve industrial peace. *See N.L.R.B. v. Burns Security Services, supra*, but where, as here, the union is fully advised of the debtor's intent to reject the contract, is represented at the proceedings held in connection with the application to reject, but does not object, the possible disruption of labor peace is minimized. The Bankruptcy Court ruled and Allied has urged that because no employer/employee relationship is at issue here, the Court need not employ the stricter standards enunciated in *Kevin Steel* and *REA Express*. In this Court's opinion there is merit to this argument.

It seems clear that the industrial peace which the *Kevin Steel* Court thought was threatened by rejection of the collective bargaining agreements involved the relationship of an employer to its employees. Thus the principal policy argument advanced by the Board in Kevin Steel focused on the effects of disaffirmance on industrial peace due to the union's potential response to the rejection. The Board opined that "permitting rejection at the expense of employees impairs industrial peace, since the only means employees have to protect [against] the losses they will suffer in such a situation is a strike." *Id.* at 703. The *Kevin Steel* Court's formulation of the equities to be balanced in such situations also

---

**9.** Appellants have cited two evidentiary rulings of the bankruptcy judge as erroneous. During the testimony of Earl Smith, Allied's Chief Executive Officer, counsel for Borman's attempted to cross–examine on the feasibility of Allied's proposed Business Plan. This evidence was relevant in appellants' opinion based on their perception of the equities to be balanced by the Bankruptcy Court. *See* discussion, *infra*, Page 979. Similarly, appellants have as-

serted that portions of the testimony given by Dr. Mark Kahn, an industrial expert called by Borman's, which was submitted on a separate record after the bankruptcy judge sustained Allied's relevancy objection, were relevant and should have been considered. Dr. Kahn's excluded testimony dealt with the impact of Allied's rejection of its multi–employer contracts upon Borman's and Chatham.

indicates the Second Circuit's concern that employer/employee relations might be adversely affected by rejection of collective bargaining agreements, for the Court, citing *In Re Overseas National Airways, supra*, suggested that some weight be given to the employees' rights under the contract. Likewise, the Court in *REA Express* found that the purpose of the Railroad Labor Act is to avoid disruptions of commerce due to "self–help, strikes, and unilateral action" on the part of the union.

The Court is therefore not completely convinced that the policies of the Labor Act combating disruptions of the industrial peace are as forceful in the context of this case. The Court acknowledges that appellants are parties to the collective bargaining agreement which was rejected and that there is ample evidence in the record supporting appellants' view that Allied's rejection of its collective bargaining agreement could have a detrimental effect on Borman's and Chatham's business prospects, but the Court is not persuaded that this constitutes the type of threat to industrial peace which formed the basis of *Kevin Steel* and *REA Express.*

Having stated these preliminary concerns, the Court will next address the claims of error made by appellants. Several arguments advanced by appellants involve a misapplication of the tests used in *Kevin Steel* and *REA Express,* and would be rejected even under the stricter standard found in those two cases. Appellants first point out that under *Kevin Steel* and *REA Express,* a decision to reject a collective bargaining agreement "should not be based solely on whether it will improve the financial status of the debtor." Instead there must be proof that the labor contracts are onerous and burdensome. Relying on the District Court's opinion in *In Re Studio Lighting,* appellants argue that the collective bargaining agreement must contain terms which are *unusually* onerous and burdensome. *Id.* at 2431. Since no such evidence was, or could be, submitted in this litigation, appellants claim error.

■ This contention, however, misperceives the Second Circuit's use of the term "onerous and burdensome". That Court did not contemplate a comparative approach to the determination of the impact of the collective bargaining agreements on the debtor; rather the language used in these two cases suggests that the finding of "onerous and burdensome" was tailored to the precise financial situation of the debtor, and specifically to the debtor's prospects for survival absent the disaffirmance. In *REA Express* the Court concluded that a collective bargaining agreement could be rejected "if [the debtor's] collective bargaining agreements with the unions . . . are too onerous and burdensome to permit it to survive . . ." *Id.* at 169. This principle has been repeated in a number of cases following *REA Express, see Bohack Corp. v. Local Union No. 807, supra* at 650; *Matter of Alan Wood Steel Co., supra* at 169, and indeed, this same language was used in *In Re Studio Lighting, supra* at 2430, the case on which appellants rely. The Court therefore concludes that appellants' contention that the Bankruptcy Court was required to find that Allied's labor contracts were somehow more burdensome on it than on its competitors, is not supported by the case law. The proper standard must be based on the ultimate effect of the collective bargaining agreement on the debtor–in–possession.

■ Appellants next argue that the Bankruptcy Court was not presented with sufficient evidence concerning the impact of the then existing labor agreements or Allied's viability as a business. It is asserted that the only evidence relevant to this issue which was presented to the bankruptcy judge was the conclusory statement of Earl W. Smith, Allied's Chief Executive Officer, that rejection of the contracts was necessary if the Business Plan was to succeed.

This argument, however, does not give a completely accurate portrayal of Smith's testimony. Smith stated not only that rejection of the collective bargaining agreements was necessary to implement the

Business Plan, but also that, without a rejection of these contracts, Allied could not survive. Transcript, pp. 62–63. There is, furthermore, sufficient circumstantial evidence to support Smith's conclusion. The evidence taken by the Bankruptcy Court showed that in the four preceding years, Allied had suffered losses of approximately $45 million and following its arrangement under Chapter XI, the corporation was losing nearly $173,000 per week. Further, the testimony indicated that Allied would fail unless the Business Plan was put into effect and that a crucial component of the Business Plan was the anticipated labor concessions which were to follow the rejection of the contracts.[10] These facts, when combined with the undisputed evidence that labor costs constituted a significant portion of operating expenses of a business in the supermarket industry, provide ample support for the conclusion reached by Allied's Chief Executive Officer and the determination made by the Bankruptcy Court.

In his testimony, Smith stated repeatedly that the proposed Business Plan would save Allied only if all of its aspects were approved. Appellants now argue that in the cross–examination of Allied's Chief Executive Officer it was conclusively demonstrated that the Business Plan was premised on several assumptions. Appellants therefore assert that under *Kevin Steel* and *REA Express*, the debtor was required to demonstrate that rejection of the labor agreements is essential to its survival. In appellants' view, this standard mandates that the debtor should not be allowed to disaffirm its collective bargaining agreements unless it is shown that only disaffirmance would assure the debtor's survival. Thus, the argument concludes, since the assumptions underlying the proposed Business Plan cast some doubt on Allied's future regardless of whether these labor contracts were rejected, the Bankruptcy Court should have considered the feasibility of Allied's Business Plan before reaching a decision on Allied's application to reject its labor agreements.

■ Appellants' argument on this point is not persuasive. The question which had to be addressed by the Bankruptcy Court under *Kevin Steel* and *REA Express* was whether the collective bargaining agreement then in effect would thwart efforts to save a failing debtor from collapse. As noted above, this fact was established. It may well be true that several other contingencies had to occur before full implementation and the ultimate success of the Business Plan could be assured, but this certainly does not compel the conclusion that Allied was foreclosed from beginning its attempt to comply with the Business Plan by rejecting these important contracts.[11] The debtor was required under the cases to prove that, absent a rejection of the collec-

---

**10.** Circumstantial evidence in support of the conclusion that Allied would fail without a modification of its labor contracts can also be found in the positions of the unions involved. The rejection and renegotiation of the contracts would have an immediate adverse impact on the unions, but they nevertheless did not object to Allied's application to reject.

**11.** In this Court's opinion, Appellants' claim that the bankruptcy judge should have considered the feasibility of Allied's Business Plan before deciding the petition for rejection turns the labor policy concern expressed in *Kevin Steel* and *REA Express* on its head and gives further proof of the Court's previously expressed view that the stricter standard contained in the Second Circuit cases does not necessarily apply here. In *Kevin Steel* and *REA Express*, the Court balanced the interests of the debtor–in–possession against the interests of its employees who may be deprived of

their "seniority, welfare and pension rights, as well as other valuable rights". Here the debtor confronted the union with a proposal for modification of the collective bargaining agreement prior to the filing of its application for rejection. The union, mindful of its rights under the contract, but also aware of the resulting loss of jobs if the debtor should fail, chose to acquiesce in the application for rejection. However, the debtor's competitors, parties to a multi employer agreement, seek to override the compromises reached by the debtor and its employees due to the competitor's conclusion that the compromise so reached would ultimately fail anyway. If appellants' view on this question were accepted by the Court neither the policies of the Bankruptcy Act–"to preserve the funds of the debtor for distribution to creditors and to give the debtor a new start" *Kevin Steel*, p. 706–nor of the Labor Act would be served.

tive bargaining agreement, its business would fail. The debtor is not required to guarantee to the Bankruptcy Court that following its rejection of the contracts, its business would be successful.

■ Finally, appellants assert that the Bankruptcy Court should have considered the interests of all parties to the collective bargaining agreements in making its determination to reject.[12] The balancing of the equities, as prescribed in *Kevin Steel* and *REA Express* should have included in appellants' view, those of Borman's and Chatham as well as the employees of Allied's two competitors. Borman's and Chatham have demonstrated that the supermarket industry is extremely competitive, particularly in the Detroit area, with a precarious balance between profit and loss for all of the corporations involved. Because of the conceded importance of labor costs to the overall expenditures in this industry, appellants maintain that even a modest adjustment of Allied's employees' wage and fringe benefit rates would have a significant impact on Allied's competitors. Appellants therefore contend that their rights and the interests of their employees should have been included in the Bankruptcy Court's balancing equation.

As stated previously, the Court has reservations regarding application of the *Kevin Steel* and *REA Express* tests to the facts of this case. Furthermore, even if the rights and interests of Allied's competitors were to be considered here, the Court would have serious concern about granting these interests any significant weight in comparison with Allied's interest and the interest of Allied's employees. Accepting the evidence

which was presented to the bankruptcy judge, the direct and primary result of Allied's inability to reject these contracts is that Allied fails and its employees are jobless. On the other hand, if Allied is allowed to disaffirm these contracts and it receives certain concessions from its employees in subsequent contract negotiations, Allied's competitors may indirectly be adversely affected.[13] In such a situation, the Court finds it difficult to conceive of a case in which the equities of the debtor's competitors could ever overcome the interests of the debtor and the debtor's employees.

These observations lead the Court to conclude that the bankruptcy judge's treatment of these issues does not constitute error. This Court, unlike the bankruptcy judge, has concluded that Borman's and Chatham were parties to a multi–employer bargaining agreement along with Allied, but such a conclusion does not compel the Court to reject the decision of the bankruptcy judge. The Bankruptcy Court did not accord the interests of Allied's competitors too little weight, for it is the opinion of this Court that under the facts of this unique case, Borman's and Chatham's interest were entitled to little or no weight in relation to the crucial and immediate interests of Allied and Allied's employees.

One final issue must be addressed by the Court. Chatham has claimed that the procedures followed by the bankruptcy judge in the week preceding the hearing on Allied's application violated the corporation's due process rights to a fair hearing. Chatham was notified orally on Friday, March 23, 1979 that Allied had rescheduled a hearing on its petition for rejection on March

12. There is some dispute between the parties whether the bankruptcy judge did or did not consider the interests of Borman's, Chatham and the employees of these two companies in reaching its decision. There are portions of the bankruptcy judge's opinion which suggest that the interests of Allied's competitors did enter into the Court's balancing. *See* Transcript, Opinion of the Court, p. 14. Appellants claim that the Court misapplied its standards is, however, further supported by the evidence which the bankruptcy judge refused to admit. *See* footnote 9, *supra*.

13. The Court recognizes that Borman's and Chatham have argued that their interests as well as those of its employees should be considered. The Court would further agree that if these two corporations are seriously injured financially that this might ultimately impact on their employees. Nevertheless, the argument on behalf of Borman's and Chatham employees loses some of its force in light of the fact that these workers were represented in the proceedings before the Bankruptcy Court through their union.

26. Chatham appeared in Court on March 26 and was permitted to intervene. The hearing was then rescheduled for Friday, March 30, 1979. On March 28 and March 29 counsel for Allied, Borman's and Chatham participated in the taking of a number of depositions. The hearings before the bankruptcy judge commenced on March 30, and at the end of the trial, counsel for Chatham requested additional time to submit a brief, but this request was denied. Chatham now claims that the speed with which this complex piece of litigation was brought to a hearing and decided by the bankruptcy judge violated the fundamental motions of notice and hearing guaranteed by the Due Process Clause of the Fifth Amendment.

At the conclusion of the proceedings on March 26, 1979, after the Bankruptcy Court considered the written and oral presentations of Borman's in support of its motion to intervene, filed by Borman's counsel, a colloquy took place between counsel and the bankruptcy judge regarding the schedule for depositions, briefing and hearings. (Transcript, March 26, 1979, pp. 58–66.)

The record indicates that all parties to this litigation were concerned with obtaining an expedited hearing on Allied's application for rejection. However, the record further demonstrates that the Bankruptcy Court attempted to insure that such a hearing would not be conducted at the expense of appellants' due process rights. Thus, before rescheduling the hearing on Allied's petition, the Bankruptcy Court requested Borman's view of the time which would be necessary to prepare for such a hearing. Chatham did not dissent from the request of Borman's counsel for two days of discovery. In such circumstances, this Court is unable to conclude that Chatham was denied due process in the Bankruptcy Court as a result of the schedule adopted by the Court on March 26, 1979. Nor does the Court consider it error for the Bankruptcy Court to have decided the ultimate issues on the basis of the record without the supplementary briefs which appellants offered to prepare. The record indicates quite clearly that the limited number of cases involving the rejection of collective bargaining agreements had been presented to the bankruptcy judge before it rendered its decision, but as the Court ruled in its oral opinion following full arguments on this question, these cases were unavailing for appellants. It bears repeating in the unique factual context of this case that "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). This Court is unable to conclude on the record before it that Chatham was denied due process by the actions of the bankruptcy judge.

The Court therefore finds no error in the bankruptcy judge's decision to allow Allied to disaffirm its labor contracts and that there is no error in the procedures employed by the bankruptcy judge in reaching that decision. For the foregoing reasons, the appeal is DISMISSED.

IT IS SO ORDERED.