**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**L. B. PRIESTER & SON, INC., Respondent.**

**No. 81–4060.**

United States Court of Appeals, Fifth Circuit.

March 5, 1982.

Elliott Moore, Deputy Associate Gen. Counsel, Joseph Alan Schwachter, N. L. R. B., Washington, D. C., for petitioner.

Paul O. Miller, III, Jackson, Miss., for respondent.

Before GARZA and RANDALL, Circuit Judges *.

RANDALL, Circuit Judge:

The National Labor Relations Board ("NLRB" or "the Board") petitions for enforcement of its order directing L. B. Priester & Son, Inc. ("Priester" or "the company") to abide by a collective bargaining agreement and to reimburse several employees for underpayments in wages. Opposing enforcement of the order, Priester argues that it permissibly withdrew from the multiemployer bargaining unit that negotiated the collective bargaining agreement and, alternately, that the Board misinterpreted certain of its provisions. We conclude that the Board's order should be enforced.

## I. Background

Priester is a general construction contractor based in Meridian, Mississippi. From 1956 until 1977, Priester was a member of the Meridian Contractors Association ("the association"), an employer organization which represents its members in negotiating collective bargaining agreements with local unions. On May 26, 1977, Local 2313, United Brotherhood of Carpenters and Joiners of America, AFL–CIO ("the union") notified the association that it desired to begin negotiations on a contract to replace the agreement between the union and the association due to expire on July 31, 1977. From June through August of that year, representatives of the parties met on several occasions to discuss a new contract. Priester's secretary-treasurer, Ralph Priester, Sr., then serving as president of the association, figured prominently in these discussions.

The final negotiating session was held on August 9. At one point in the meeting, the members of the association's bargaining committee adjourned to confer regarding the most troublesome issue: the wage increase. Ralph Priester suggested to the committee that no increase be offered, declaring that his firm could not afford an increase in labor costs and threatening to withdraw from the association if one was offered. The committee nevertheless decided to propose an increase to the union representatives, who accepted the proposal pending ratification by their membership. On August 16, one day after the agreement was ratified, the company withdrew from the association and Ralph Priester resigned as its president. Approximately one week later, the company informed a union representative of this action and refused to sign the new agreement.

The union filed an unfair labor practice charge on September 30, alleging that the company unlawfully refused to bargain by not signing the contract and by not complying with its terms. The company signed an informal settlement agreement two months later in which it agreed to abide by the new contract and to compensate employees who were paid less than the contract rate for their work. Despite this settlement, a second charge was filed on May 22, 1978 averring that Priester continued to refuse to pay the contract scale. The NLRB subsequently withdrew its approval of the settlement of the first charge, issued a consolidated complaint and scheduled a hearing before an administrative law judge (ALJ).

Following the hearing, the ALJ found that Priester's withdrawal from the bargaining unit was not excused by economic hardship. The ALJ also rejected Priester's claims narrowing the geographical boundaries of the contract, restricting it to members only, and limiting its definition of "journeyman." The ALJ concluded that Priester had violated §§ 8(a)(1), (5) and § 8(d) of the National Labor Relations Act ("NLRA" or "the Act")[1] by refusing to sign

---

* Due to his death on December 22, 1981, Judge Ainsworth did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1. Section 8(a) of the NLRA, 29 U.S.C. § 158(a), provides in pertinent part:

 (a) It shall be an unfair labor practice for an employer—

the agreement and honor its terms. The Board affirmed the ALJ's order, and modified it to remedy wage underpayments occurring before settlement of the first charge. Pursuant to § 10(e) of the NLRA, 29 U.S.C. § 160(e), the Board now seeks enforcement of this order.

## II. Withdrawal from Multiemployer Bargaining Units: Extreme· Financial Pressures

### A. Standard of Review.

 Disputing the Board's conclusion that it unlawfully refused to bargain, Priester contends that its withdrawal was justified by serious economic difficulties. The Board argues that Priester's financial troubles were not acute enough to permit it to abandon an established multiemployer bargaining unit after negotiations had begun. The standard guiding our consideration of these arguments is tailored to afford appropriate deference to the Board's expertise in "applying the general provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963). Whether Priester's conduct amounts to a statutory refusal to bargain is a mixed question of fact and law, requiring an examination of the legal effect of a given set of facts. The NLRB's resolution of such questions is to be upheld if reasonable, consistent with the Act, and based on findings supported by substantial evidence. *NLRB v. Yeshiva University*, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980); *Ford Motor Co. v. NLRB*, 441 U.S. 488, 496–97, 99 S.Ct. 1842, 1848–49, 60 L.Ed.2d 420 (1979).[2] Respect for the Board's expertise is particularly proper here, since Congress' deliberate inaction with regard to multiemployer bargaining indicates a commitment by Congress of the issues it raises to the Board's specialized judgment. *Charles D. Bonanno Linen Service, Inc. v. NLRB*, —— U.S. ——, ——, 102 S.Ct. 720, 723, 70 L.Ed.2d 656 (1982); *NLRB v. Truck Drivers Union*, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957) (*Buffalo Linen*).

### B. The *Retail Associates* Rule.

Section 9(a) of the NLRA, 29 U.S.C. § 159(a), provides that employee bargaining representatives shall be selected by "the majority of the employees in a unit appropriate for such purposes." Section 9(b) charges the Board with the responsibility of deciding whether "the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit or subdivision thereof...." 29 U.S.C. § 159(b). Nowhere does the Act mention multiemployer bargaining units; the prototypical unit envisioned by the NLRA is employerwide or smaller. Despite the absence of explicit statutory authority, however, bargaining between employer coalitions and large unions representing their workers predates the NLRA and has expanded since its enactment. It also has been held to fall within the Board's purview. In *Buffalo Linen*, the Supreme Court inferred an intent that the Board continue to certify and regulate multiemployer units from Congress' rejection of efforts to curb multiemployer bargaining. *Id.* at 96, 77 S.Ct. at 647. The Court reaffirmed this position in *Bonanno*. *Id.* at ——, 102 S.Ct. at 725.

(1) to interfere with, restrain or coerce employees in the exercise of rights guaranteed in section 157 of this title;

\* \* \*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

Section 8(d), 29 U.S.C. § 158(d), provides in part:

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party....

2. Our review of mixed questions of fact and law is broader in other contexts. *See, e.g., Washington v. Watkins*, 655 F.2d 1346, 1353 (5th Cir. 1981).

The prevalence of multiemployer bargaining[3] is attributable to the advantages it offers employers and unions, especially in certain types of industries in which employerwide bargaining may be difficult. Each side may be able to obtain an improved bargaining position, more reliable information on competitive conditions, and the opportunity for less frequent and less costly negotiations. The enhanced stability in labor-management relations that may result is also a pronounced objective of national labor policy. *See* NLRA § 1, 29 U.S.C. § 151. As we recently noted, "[t]he mechanism of a MEBU [multiemployer bargaining unit] can serve an important function in promoting efficient and consistent bargaining in an industry, as well as promoting the bedrock goal of industrial peace." *Baton Rouge Building and Construction Trades Council v. E. C. Schafer Construction Co.,* 657 F.2d 806, 811 (5th Cir. 1981).

Multiemployer bargaining units are viable only if stable. To ensure stability, the Board has adopted guidelines governing resignation from such units, with the goal of removing the threat of withdrawal as a bargaining tool. Under these guidelines, announced in *Retail Associates,* 120 N.L.R.B. 388 (1958), upon adequate notice a party may withdraw freely prior to the commencement of negotiations for a new contract. After negotiations have begun, however, withdrawal is permissible only with consent of the parties involved[4] or in "unusual circumstances." This standard has won judicial approval.[5] Subsequent decisions by the Board and the courts have defined what sorts of circumstances are unusual enough to excuse untimely withdrawal. In *Bonanno,* the Supreme Court resolved a split among the circuits by upholding the Board's and this court's view that a bargaining impasse alone does not trigger a right to withdraw unilaterally. *NLRB v. Marine Machine Works,* 635 F.2d 522 (5th Cir. 1981); *Hi-Way Billboards, Inc.,* 206 N.L.R.B. 22 (1973). Three other situations, however, have been held to excuse untimely withdrawal. At least one court, though not the Board, has held that an employer may withdraw where the employer association's negotiating committee does not fairly represent its interests. *NLRB v. Siebler Heating & Air Conditioning, Inc.,* 563 F.2d 366 (8th Cir. 1977), *cert. denied,* 437 U.S. 911, 98 S.Ct. 3104, 57 L.Ed.2d 1142 (1978). Withdrawal after negotiations have commenced also has been permitted where the unit has been seriously fragmented, *e.g., NLRB v. Southwestern Colorado Contractors Ass'n,* 447 F.2d 968, 969–70 (10th Cir. 1971); *Typographic Service Co.,* 238 N.L.R.B. 1565 (1978), or where an employer is suffering from extreme financial pressures. Priester contends that its withdrawal is excused by this last exception.

Although the Board has permitted some resignations from multiemployer bargaining due to economic circumstances, it consistently has maintained that the employer's financial plight must be truly critical before withdrawal will be excused. The withdrawing employer must face *"dire* economic circumstances, *i.e.,* circumstances in which the very existence of an employer as a viable business entity has ceased or is about to cease." *Hi-Way Billboards, Inc., supra,* 206 N.L.R.B. at 23 (emphasis in original). The NLRB has approved withdrawal only when the employer has demonstrated that it was in immediate jeopardy of at least partial closing. The Board's action in *U. S. Lingerie Corp.,* 170 N.L.R.B. 750 (1968), illustrates this position. The employer in that case, a member of an employer association, had filed a bankruptcy reorganization petition and was attempting to

---

**3.** In *Bonanno,* the Supreme Court observed that 42% of major collective bargaining agreements were negotiated in multiemployer units. *Id.* at ---- n.4, 102 S.Ct. at 724 n.4.

**4.** The NLRB held in *Teamsters Union Local No. 378 (Olympia Automobile Dealers),* 243 N.L.R.B. 1086 (1979) that the consent of other employers in the unit, as well as the union's, is necessary before it will sanction a withdrawal after the start of contract talks.

**5.** *See, e.g., Carvel Co. v. NLRB,* 560 F.2d 1030 (1st Cir. 1977), *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1240, 55 L.Ed.2d 766 (1978); *NLRB v. Beck Engraving Co.,* 522 F.2d 475 (3rd Cir. 1975); *NLRB v. John J. Corbett Press, Inc.,* 401 F.2d 673 (2d Cir. 1968).

reach an accommodation with its creditors to permit a relocation of its business. When it finally secured an arrangement enabling it to close and relocate, negotiations for a new collective bargaining agreement were already underway. The employer then belatedly withdrew from the association. The NLRB approved the withdrawal, noting that the employer had informed the union of its grave economic situation before negotiations had begun. Similarly, in *Spun-Jee Corp.*, 171 N.L.R.B. 557 (1968), the employer sought special treatment from the union because of economic difficulties before the commencement of a new round of bargaining. It informed union officials that its plant would have to be relocated in the event of a wage increase. The Board held that the firm's subsequent withdrawal was excused by severe financial pressures. The NLRB also approved a withdrawal when the employer was threatened with the immediate loss of its entire skilled work force. *Atlas Electric Service Co.*, 176 N.L.R.B. 827 (1969) (alternate holding). In contrast, the Board affirmed an ALJ's denial of an employer's claim of financial hardship based on a sudden loss of one fourth of its business. *Serv-All Co.*, 199 N.L.R.B. 1131 (1972).

The few courts that have considered the issue have adopted the Board's strict approach. The only decision allowing a withdrawal during negotiations for financial reasons found a satisfactory showing of "*extreme financial hardship* threatening the existence of the employer." *NLRB v. Custom Sheet Metal & Service Co.*, 666 F.2d 454 (10th Cir. 1981) (emphasis in original). In that case, the employer was a member of an employer association in the midst of a strike following the failure of negotiations aiming toward a new labor contract. It was informed by a customer responsible for seventy-five percent of its business that future business would be transferred to oth-

er suppliers unless a current order was filled on schedule. Confronted with this grim prospect, the employer withdrew from the employer association conducting the negotiations. The court overruled the Board's determination that the withdrawal was unjustified, concluding that the imminent threat of a crippling loss of business was sufficient to excuse a belated withdrawal. The court found that the timing of the employer's action verified that its sole motivation was to protect its business. Moreover, the court noted that the employer was already receiving individualized treatment from the union because of a change in its business from construction to manufacturing sheet metal products. The remaining members of the association received no special treatment from the union. *Id.* at 456.

The court distinguished its decision in *NLRB v. Tulsa Sheet Metal Works, Inc.*, 367 F.2d 55 (10th Cir. 1966), where it held that the employer's claim that a new agreement would be financially ruinous did not justify withdrawal.[6] The court explained that in the case before it, unlike *Tulsa Sheet Metal*, the employer was faced with the immediate loss of its principal customer. The employer in *Tulsa Sheet Metal* also was a "solid member" of the employer organization, while the withdrawing employer in *Custom Sheet Metal* was a new member who had been receiving special concessions from the union due to the unique nature of its business. *Id.* at 459.

■ The Board's dire circumstances test, applied in *Custom Sheet Metal*, is an effort to achieve a sound equilibrium among the "conflicting legitimate interests" that arise in multiemployer bargaining. *NLRB v. Truck Drivers Union, supra*, 353 U.S. at 96, 77 S.Ct. at 648. Such bargaining is feasible only if those that consent to participate are bound by the results.[7] Permitting with-

---

**6.** A similar argument was rejected in *Universal Insulation Corp. v. NLRB*, 361 F.2d 406 (6th Cir. 1966), where the employer threatened to withdraw if a wage increase was included in a new contract. No other evidence of financial hardship was introduced. The court ruled that

the employer's subsequent withdrawal was impermissible.

**7.** As the First Circuit has explained:

It is apparent that, absent some constraints on the parties' freedom to withdraw from a multiemployer unit during the course of ne-

drawal by employers who are struggling under the threat of imminent failure acknowledges that these employers are in no position to adhere to the agreement negotiated by the group. Limiting the right to withdraw to these employers discourages others from attempting to fabricate financial emergencies to evade unfavorable agreements, while it accommodates true hardship. We approve the Board's rule as a reasonable construction of the Act adopted to reinforce the collective bargaining process.

### C. Priester's Financial Troubles.

■ Priester bore the burden of demonstrating the gravity of its economic condition. *NLRB v. Acme Wire Works, Inc.*, 582 F.2d 153, 158 (2d Cir. 1978). It adduced no financial statements, nor any evidence of the added cost the wage increase would impose, even though it submitted that it could not withstand the burden of the increase because of dire economic circumstances. The only evidence the company presented was the testimony of its president, Lee Priester, Jr.[8] He stated that business had been slipping in recent years due to keen competition and the reluctance of bonding companies to extend security on large projects because of the advancing age of Mr. Priester and his brother, the principal owners of the company. According to his testimony, the company earned over $17,000 in 1976, but lost approximately $40,-000 in 1977, the year of the negotiations, and $70,000 in 1978. These losses were accompanied by a decrease in volume of business.

■ Although Mr. Priester's testimony may establish that the company was in a depressed state, it does not suggest that it was in the throes of an immediate crisis. Because its principal figures were in their mid-seventies, the company was experiencing a gradual decline. Unlike the employer in *Custom Sheet Metal* and the Board's decisions, Priester was not facing a choice between withdrawal and financial ruin. Neither bankruptcy nor dissolution was imminent. In 1976, the year preceding the negotiations, Priester in fact had shown a profit. The 1977 losses were significant, but it was not established that they were realized in their entirety by the time the company withdrew in August of that year. The 1978 losses obviously did not influence Priester's decision to withdraw in 1977. The company's action logically "is to be tested by considering the actual motivation of the employer seeking to withdraw from the unit," *NLRB v. Custom Wood Specialties, Inc.*, 622 F.2d 381, 385 (8th Cir. 1980), not by examining plausible rationales constructed with the benefit of hindsight. To justify its untimely withdrawal, Priester needed to show more profound economic difficulties, and needed to make this showing through proof more specific than the oral testimony of its president.

■ Priester's conduct reveals that it did not view its circumstances as critical in 1977. It could have withdrawn from the unit unilaterally before negotiations began, or given the union notice of a need for specialized treatment, but did neither.[9] In-

gotiations, the utility of this bargaining process would be substantially undermined. Withdrawal by unit members and their negotiation of separate contracts obviously would reduce the efficiency of the bargaining process. Perhaps more importantly, if the withdrawing members were successful in obtaining more favorable contractual terms, their competitive advantage would encourage additional defections. In order to forestall such withdrawals, the unit's bargaining representative likely would adopt a more extreme position and a more intransigent approach, thereby diminishing the likelihood of a prompt and peaceful settlement.

*N.L.R.B. v. Charles D. Bonanno Linen Service, Inc.*, 630 F.2d 25, 28 (1st Cir. 1980), aff'd, —— U.S. ----, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982).

8. The NLRB's General Counsel introduced no evidence disputing Mr. Priester's testimony.

9. *See Genesco, Inc. v. Joint Council 13, United Shoe Workers*, 341 F.2d 482, 489 (2d Cir. 1965) ("multiemployer bargaining does not altogether preclude demand for specialized treatment of special problems; what is required, if an employer or union is unwilling to be bound by a general settlement, is that the particularized demand be made early, unequivocally and persistently.").

stead, the company assumed a leading role in the negotiations. Its first complaint of financial hardship and threat of withdrawal came at the climax of negotiations, when it disapproved of a wage increase proposal made by other members of the employer association. There was no evidence of any abrupt change in financial position that might have compelled a sudden shift in the company's attitude. If it were embroiled in financial difficulties sufficient to excuse withdrawal, it would not have concealed its woes until the negotiations were nearly concluded. Furthermore, after the first unfair labor practice charge was filed against Priester, in connection with a settlement it signed a letter of assent to the new collective bargaining agreement. If its plight were genuinely severe, it could not have signed such an agreement in good faith. Such behavior suggests that Priester's withdrawal was prompted by disappointment with the outcome of the negotiations, rather than by extreme economic pressures. Clearly, "dissatisfaction with proposed wage scales is not justification for withdrawal from the unit." *NLRB v. Tulsa Sheet Metal, Inc., supra*, 367 F.2d at 58.

The Board's judgment that Priester violated the Act is consistent with precedent and reasonable in view of the need to preserve the stability of multiemployer bargaining units. *Central Florida Sheet Metal Contractors Ass'n v. NLRB*, 664 F.2d 489, 496 (5th Cir. 1981). Its restriction of the occasions when an employer may withdraw from a unit due to financial circumstances is calculated to ensure multiemployer bargaining's continued vitality.

### III. Unilateral Wage Changes

Since its withdrawal from the multiemployer bargaining unit was untimely and unexcused by financial circumstances,

Priester was obligated to sign and honor the collective bargaining agreement negotiated in its behalf. *NLRB v. Strong*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969). The union charged, and the Board found, that Priester instead had unilaterally decreased the agreed pay scale. In opposing enforcement, Priester renews arguments it made before the Board regarding the proper interpretation of the contract.[10]

Unilateral changes in wages or other mandatory subjects of bargaining constitute unlawful refusals to bargain. *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 674, 101 S.Ct. 2573, 2578, 69 L.Ed.2d 318 (1981); *NLRB v. Haberman Construction Corp.*, 641 F.2d 351, 357 (5th Cir. 1981) (en banc); 29 U.S.C. § 158(a)(1), (5), (d). To determine whether Priester had unilaterally changed the negotiated wage scale, the Board had to interpret the collective bargaining agreement. Such interpretations are well within the Board's authority. *NLRB v. Strong, supra*, 393 U.S. at 360–61, 89 S.Ct. at 544–45; *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 429–30, 87 S.Ct. 559, 564–65, 17 L.Ed.2d 486 (1967).

As an aid in interpreting the agreement, the ALJ heard extrinsic evidence regarding the meanings the parties assigned to its various provisions. The inquiry was essentially factual. *NLRB v. System Council T–6, International Brotherhood of Electrical Workers*, 599 F.2d 5, 8 (1st Cir. 1979); *NLRB v. Independent Stave Co.*, 591 F.2d 443, 447 (8th Cir.), *cert. denied*, 444 U.S. 829, 100 S.Ct. 55, 62 L.Ed.2d 37 (1979). The ALJ's findings relevant here were affirmed by the Board. Our standard of review is familiar: factual findings by the NLRB are to be upheld if supported by substantial evidence based on the record as a whole. NLRA § 10(e), 29 U.S.C. § 160(e).[11]

---

**10.** Before the Board, Priester argued that remedies for certain wage underpayments occurring before the filing of the first charge were barred by the vacated informal settlement agreement of NLRA § 10(b), 29 U.S.C. § 160(b). The Board rejected these arguments and Priester has not pursued them in this court.

**11.** Some of our cases indicate that where the Board merely interprets a written statement, our review is plenary. *Florida Steel Corp. v. NLRB*, 587 F.2d 735, 751 (5th Cir. 1979); *Swearingen Aviation Corp. v. NLRB*, 568 F.2d 458, 463 (5th Cir. 1978). Here, rather than interpreting the plain meaning of a document's language, the ALJ heard extrinsic evidence to

■■■ Attempting to reduce the scope of its liability, Priester first argues that the agreement applies only to union members. The Board affirmed the ALJ's finding that the evidence indicated that the parties intended the contract to apply to all carpenter employees of association employers, not merely to union members. The ALJ found that the contract referred to both "members" and "employees," and relied primarily on the uncontradicted testimony of the union representative that the contract applied to all carpenter employees. No evidence was presented of a contrary practice during the long history of agreements between the union and the association. Priester urges that since the Board also found that "apprentice" in the contract referred to the union's apprentice program, the entire agreement should be viewed as applying only to union members. This view, however, is unsupported by testimony and not borne out by prior practice of the union and the association. Substantial evidence is in accord with the Board's finding.

■■ Priester's second contention is that the Board erred in concluding that the contractual term "journeyman" applied to all carpenters hired by association members, except participants in the union's apprentice program. Conceding that "apprentice" referred only to enrollees in the union's apprentice program, Priester argues that the NLRB's interpretation of "journeyman" would impair the attractiveness of that program by paying higher journeyman's wages to all others doing carpentry work. Priester's interpretation, however, is unsubstantiated by testimony. No evidence was introduced suggesting that "journeyman" was to be applied to employees equipped with specific skills. Instead, the assumption apparently underlying the agreement was that the employers would not hire un-skilled carpenters unworthy of journeyman's wages. An interpretation calling for an on site appraisal of an employee's skills is untenable, since it would leave the employee's rate of compensation entirely to the employer's discretion.

■■ Priester further contends in any event that the provision should have been construed against the union because of evidence that the union committed the oral agreement to writing. Collective bargaining agreements, however, are not rigidly governed "by the same old common-law concepts, which control private contracts." *Transportation-Communication Employees Union v. Union Pacific Railroad*, 385 U.S. 157, 160–161, 87 S.Ct. 369, 371, 17 L.Ed.2d 264 (1966); *see Kaufman and Broad Home Systems, Inc. v. International Brotherhood of Firemen and Oilers*, 607 F.2d 1104, 1108–09 (5th Cir. 1979); *Certified Corp. v. Teamsters Local 996*, 597 F.2d 1269, 1271 (9th Cir. 1979); *Amcar Division, ACF Industries, Inc. v. NLRB*, 592 F.2d 422, 429 (8th Cir. 1979); *Darnel v. East*, 573 F.2d 534, 537 (8th Cir. 1978). Even if this maxim of construction were controlling with respect to collective bargaining agreements generally, we would not apply it here. Contracts are to be construed against the drafter only as a matter of last resort, when doubt persists "after applying all of the ordinary processes of interpretation, including all existing usages, general, local, technical, trade and the custom and agreement of the two parties with each other, having admitted in evidence and duly weighed all the relevant circumstances and communications between the parties . . ." 3 A. Corbin, Contracts § 559 (1960). It does not serve as "an alternative to construing a contract as the parties intended." *Board of Trade of San Francisco v. Swiss Credit Bank*, 597 F.2d 146, 149 (9th Cir.

---

resolve ambiguities in the agreement. His findings based on such evidence pertain to factual disputes and should be reversed only if not supported by substantial evidence. Likewise, it is well established in diversity cases that where the district court hears extrinsic evidence of the parties' intent to resolve contractual ambiguities the court's findings are reviewable only for clear error. *Steuber Co. v. Hercu-*

*les, Inc.*, 646 F.2d 1093, 1098 (5th Cir. 1981); *In re Stratford of Texas, Inc.*, 635 F.2d 365, 368 (5th Cir. 1981); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 (5th Cir. 1981); *Thorton v. Bean Contracting Co.*, 592 F.2d 1287, 1290 (5th Cir.), *modified*, 597 F.2d 62 (5th Cir. 1979); *Makofsky v. Cunningham*, 576 F.2d 1223, 1229 n.7 (5th Cir. 1978).

1979). Here, the ALJ weighed testimony and reached a practical interpretation supported by substantial evidence considering the record in its entirety.

■ Finally, the company submits that the Board and the ALJ misinterpreted the following provision setting forth the geographic scope of the agreement:

[T]he Association recognizes the Union as the exclusive bargaining representative for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment for the employee within and under the jurisdiction of the Union in the following Counties: Lauderdale, Kemper, Neshoba, Clarke, and Newton Counties in Mississippi, Choctaw and Sumter Counties Alabama west of Highway 17 including the cities bordering Highway 17 inside their city limit lines. The Association recognizes that the Union also represents the following Counties or parts thereof which is not part of this Agreement: Jones, Jasper, Smith, Simpson, Covington, and Wayne Counties in Mississippi, Washington County in Alabama.

Priester contends that it should not have been held liable for underpayments on projects within the counties "not part of this Agreement." At the hearing, the parties agreed that the final sentence of the above provision was inserted into the agreement because of a merger between the union and another local representing the counties enumerated in that sentence. The parties also agreed that the purpose of the final sentence was to allay the employers' concern that the agreement might be construed to bind employers not represented by the Meridian Contractors Association. The union representative testified that the association expressly agreed that the contract wage scale would apply to carpenters employed by the association when operating in the counties listed in the final sentence. The company's only witness on this point, Ralph Priester, admitted that he could not remember whether such a commitment was made, but did declare that it was impossible for him to have made such a promise. The ALJ credited the union representative's more specific recollection of the negotiations, and the Board affirmed. Credibility determinations by an ALJ are rarely disturbed, *NLRB v. Proler International Corp.*, 635 F.2d 351, 355 (5th Cir. 1981); *NLRB v. Southern Plasma Corp.*, 626 F.2d 1287, 1293 (5th Cir. 1980), and we do not find the ALJ's choice here to have been inherently unreasonable.

■ Priester characterizes the above provision as unambiguous and protests the ALJ's resort to extrinsic evidence to shed light on its meaning. The language of the provision, however, seems far from clear. Since the verb "is" grammatically takes a singular subject, it is not entirely certain what subject "is not a part of this Agreement." Further, assuming that the plural form of the verb was intended and that the enumerated counties are not a part of the agreement, the significance of that exclusion remains ambiguous. Admission of extrinsic evidence to resolve an ambiguity is proper in interpreting any contract. Moreover, as noted above, rules governing the interpretation of ordinary contracts are not strictly applicable to collective bargaining agreements. Rigid restrictions on the admission of parol evidence in this context are inappropriate. *International Association of Machinists and Aerospace Workers Lodge No. 1194 v. Sargent Industries*, 522 F.2d 280, 282 (6th Cir. 1975); *Tolbert v. Union Carbide Corp.*, 495 F.2d 719, 721 (4th Cir. 1974); *Communications Workers of America v. Pacific Northwest Bell Telephone Co.*, 337 F.2d 455, 459 (9th Cir. 1964).

The Board properly found that Priester had unilaterally altered wages governed by the collective bargaining agreement which it was bound to heed because of its continuing membership in the employers association. Accordingly, the NLRB's remedial order is

ENFORCED.