**In the Matter of ALLIED SUPERMARKETS, INC., a Delaware corporation, Debtor.**

**and**

**In the Matter of GREAT SCOTT SUPERMARKETS, INC., a Michigan corporation, Debtor.**

**Bankruptcy Nos. 78–92872–W, 78–92871–W.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Aug. 12, 1983.

Sheldon S. Toll, Detroit, Mich., for Allied Supermarkets, Inc.

Daniel M. Share, Detroit, Mich., for Borman's.

## MEMORANDUM OPINION AND ORDER

GEORGE E. WOODS, Bankruptcy Judge.

### I.

This matter is before the Court on a claim for damages by Borman's, Inc. (Borman's) in the amount of $6,474,963.00. Borman's operates a supermarket chain in the metropolitan Detroit area. It is in competition with Allied Supermarkets, Inc. (Allied), the debtor.

### II.

In the past Allied, Borman's and Chatham Supermarkets, Inc. (Chatham) have engaged in collective bargaining with the Retail Store Employees Union Local No. 36, Retail Store Employees Union Local No. 876 (Retail Clerks), and Amalgamated Meat Cutters and Butcher-Workmen of North America Local No. 539 (Meat Cutters) through the United Supermarket Association (USA). USA was formed as a Michigan non-profit corporation on October 3, 1941, but forfeited its charter in 1943. Since 1943, USA has not been a corporation, nor has it filed under the Michigan Assumed Name statute. It has no board of directors, no by-laws and it collects no dues. It consists of a single labor consultant, Jack Bushkin. Bushkin has been USA's designated agent for the negotiation of labor contracts with the Retail Clerks and the Meat Cutters since 1941. Bushkin does not receive compensation for his services from USA, rather he is paid for his services by Allied, Borman's and Chatham, respectively and pro-rata. The only power of attorney provided the USA was executed in the early 1960's.

During the early 1970's several attempts were made by the food retailers to formalize a multi-employer bargaining group. In 1974, six major food chains, including Borman's and Allied, drafted a document providing for joint collective bargaining with Local 876 of the Retail Store Employees Union.[1] A & P subsequently withdrew from the proposed unit and the agreement was never finalized. In 1976, the six food chains attempted to form the Metropolitan Detroit Food Employers Labor Council for the purpose of joint collective bargaining with the International Brotherhood of Teamsters Union, Local 337. Action on the Metropolitan Detroit Food Employers La-

---

1. The six major food chains were Allied, Borman's, Chatham, Great Scott Supermarkets, Inc. (subsequently acquired by Allied), Kroger Co., and the Great Atlantic and Pacific Tea Co. (A & P).

bor Council was aborted by Borman's refusal to sign the finalized document.[2] Drafts of the 1974 and the 1976 agreements permitted a signatory employer to modify a union contract previously entered into by the group, provided that notice thereof was given to the other employers.

In 1977, Allied, Borman's and Chatham bargained with the Retail Clerks and the Meat Cutters on a multi-employer basis.[3] The following procedures occurred. Allied, Borman's and Chatham first met among themselves to establish common contract proposals. Once proposals were agreed upon, contract negotiations with the Retail Clerks and the Meat Cutters were conducted by Bushkin, as the representative of the USA. At the close of negotiations, a handwritten memorandum setting forth the conditions agreed upon was drafted. The memorandum was signed by the union, Bushkin and a representative of each of the three corporations. The proposed agreement was then presented to the employees of Allied, Borman's and Chatham for a ratification vote. Ratification of the agreement was by aggregation of the votes on a union-wide basis. Following ratification, a contract was prepared by the union and forwarded to Bushkin. Bushkin thereupon circulated copies of the contract to each of the employers. Upon employer approval, Bushkin signed the agreement for USA. Individual contracts were subsequently prepared for and signed by each supermarket chain. Following ratification, each company individually administered the grievance and arbitration provisions of the contracts.

The resulting collective bargaining agreements covered the term of March 27, 1977 through March 27, 1980. The contracts negotiated with the Retail Clerks and the Meat Cutters contained a maintenance of standards clause, providing that all conditions of employment, relating to wages, hours of work, overtime differentials and general working conditions, would be maintained at not less than the highest minimum standards in effect at the time of the signing of the agreement.[4] The contracts did not contain a "most favored nation clause".[5]

### III.

On November 6, 1978, Allied filed a petition for arrangement under Chapter XI of the Bankruptcy Act.[6] Allied was subsequently authorized as debtor in possession to continue the operation of its business and management of its property, and thereafter submitted to the bankruptcy court a "Business Plan" proposing the restructing of its business. An essential element of the plan was the rejection of executory labor contracts and renegotiation of the agreements through the collective bargaining process. The Business Plan had the approval of the Creditor's Committee. Allied had also received tentative approval from the affected unions.

On March 26, 1979, the bankruptcy court, the Honorable Harry Hackett presiding, convened a hearing on Allied's application to reject labor contracts.[7] Representatives of Borman's and Chatham appeared before the Court and requested permission to intervene, on the basis that they would be adversely affected should Allied be permitted to reject the labor contracts. The bank-

---

2. Borman's refused to sign the 1976 agreement because of its concern that the national chains, Kroger and A & P, would refuse to honor the mutual lock-out provisions.

3. Allied has admitted, for purposes of this proceeding, that it, Borman's and Chatham bargained with the Retail Clerks and the Meat Cutters in 1977 through the USA on a multi-employer basis.

4. See, 1977 Retail Clerks and Meat Cutters agreements, Articles IX and X, respectively.

5. A most favored nation clause prevents members of a multi-employer bargaining group from obtaining modifications to the contract not available to the other employers.

6. This petition was filed before the effective date of the Revised Bankruptcy Act of 1978, 11 U.S.C. § 101 *et seq.*, and is accordingly governed by former law.

7. Allied sought rejection of the labor contract pursuant to § 313(1) of the Act, 11 U.S.C. § 713(1).

ruptcy court allowed the interventions and rescheduled the hearing.

The hearing resumed on March 30, 1979. The evidence presented indicated that Allied had been incurring substantial losses for a number of years in its supermarket operations. Earl W. Smith, Allied's Chief Executive Officer, testified that the corporation's losses in March of 1979 totaled $170,000.00 per week and that only the immediate implementation of the Business Plan would allow Allied to remain viable. Smith expressed the opinion that the Business Plan would not be feasible absent employee concessions.

All other interested parties, including the unions, either urged approval of the plan or raised no objection to it, with the exception of Borman's and Chatham. Borman's and Chatham argued that either Allied could not reject the labor contracts without their approval, or, alternatively, rejection required the weighing of their interests against those of Allied under a strict legal standard. At the conclusion of the hearing, the bankruptcy court held that Allied could reject the labor contracts.

Borman's and Chatham appealed from the ruling of the bankruptcy judge. United States District Judge Philip Pratt held that the three supermarket competitors did constitute a multi-employer bargaining unit, but, that the rights and interests of the employees of Chatham and Borman's did not have to be considered by the bankruptcy court in determining whether to allow Allied to reject its labor contracts. *Borman's, Inc. v. Allied Supermarkets, Inc.,* 6 B.R. 968 (E.D.Mich.1980).

Borman's appealed the decision of the district court to the Sixth Circuit. On May 11, 1983, the Sixth Circuit issued a per curiam opinion concluding that an employer's interest in holding another employer to the terms of a labor contract negotiated by a multi-employer bargaining unit need not be weighed when passing upon applications to reject executory labor contracts. *Borman's, Inc. v. Allied Supermarkets, Inc.,* 706 F.2d 187 (6th Cir.1983). The Sixth Circuit added by way of footnote:

The insubstantiality of Borman's interests in Allied's applications becomes even more apparent when one considers that Allied always retained a right to withdraw from the multiemployer bargaining unit without the approval of the other employer members. Before the commencement of bargaining an individual member of a multiemployer bargaining unit may withdraw upon timely written notice to the union. *See, e.g., Retail Associates, Inc.,* 120 N.L.R.B. 388 (1958). After the multiemployer bargaining unit has commenced negotiations with a union, an individual employer may still withdraw where the union consents, *e.g., Hotel and Restaurant Employees,* 240 N.L.R.B. 757, 759 (1979), or where the employer faces "unusual circumstances" such as "evident economic hardship." *Spun-Jee Corp.,* 171 N.L.R.B. 557, 558 (1968). None of these recognized methods of withdrawal requires the approval of the other employer members of the multiemployer association. Here Allied both received the consent of the unions and faced extreme economic hardship.

706 F.2d at 191, n. 9.

On May 14, 1981, Borman's filed the claim for damages presently at issue, asserting that Allied's rejection of the collective bargaining agreements was a breach of a contract by Allied with Borman's and Chatham. On June 9, 1981, Allied filed a general objection to the claim. In February of 1982, Borman's filed a motion for partial summary judgment. In support of its motion, Borman's asserted that Judge Pratt's decision was determinative on the issue of the existence of the contract relied on as the basis for the claim. In a bench opinion issued April 26, 1982, this Court denied the motion. In August of 1982, the issues of liability and damages were bifurcated for trial. On October 17, 1982, Allied filed an amended objection raising defenses under the Statute of Frauds and the antitrust laws. A subsequent motion by Borman's to strike the amended objection was denied; a motion by Borman's for partial summary judgment with respect to the an-

titrust defense was taken under advisement. Following trial on November 18 and 19, 1982, the issue of liability was submitted for decision.

### IV.

With respect to the issue of liability, Borman's asserts that as a member of USA Allied agreed to pay the Meat Cutters and the Retail Clerks uniform wages and benefits during the term of the 1977 collective bargaining agreements. This being the case, Borman's maintains that Allied's rejection of the labor agreements was a breach of a contract by Allied with Borman's and Chatham to refrain from modifying the terms of the labor agreements with the unions without the other employers' consent. Borman's first argues that the memoranda executed by USA and its members at the conclusion of the multi-employer collective bargaining in 1977 constituted an express contract obligating Allied, Borman's and Chatham to pay the Retail Clerks and the Meat Cutters the same wages and benefits during the term of the collective bargaining agreements. Alternatively, Borman's asserts that Allied, Borman's and Chatham had an implied-in-fact contract to pay uniform wages and benefits.

Allied disputes the contention that an express or an implied contract existed among Borman's, Chatham and itself. Moreover, Allied maintains that, even if such a contract existed, no breach occurred since an implied condition to any contract was that an employer's duty thereunder would be discharged if performance would cause bankruptcy. Alternatively, Allied argues that any contract found to exist would be in violation of the Statute of Frauds and the antitrust laws.

Borman's responds to Allied's Statute of Frauds defense by maintaining first, that the statute is satisfied by the existing memoranda and, second, that the doctrine of

equitable estoppel bars Allied from raising the statute as a defense. Borman's raises the labor law exemption to counter Allied's antitrust defense.

### V.

The threshold question presented to this Court concerns the claimed existence of a contract between Borman's, Chatham and Allied.

### A.

Borman's first argues that the 1977 memoranda and the resulting collective bargaining contracts with the Meat Cutters and the Retail Clerks constitute an express contract among Borman's, Allied and Chatham.[8] Borman's asserts that the language of the 1977 labor contracts and the manner in which they were signed demonstrates that the parties intended the obligation to pay specified wages and benefits to run not only between each employer and the unions but among the employers themselves. The Court does not agree.

■ An express contract is one in which terms are openly uttered and avowed at the time of making. It is an actual agreement of the parties stated in distinct and explicit language, either orally or in writing. *McDonald v. Thompson*, 184 U.S. 71, 22 S.Ct. 297, 46 L.Ed. 437 (1901); *McInerney v. Detroit Trust Company*, 279 Mich. 42, 271 N.W. 545 (1937).

■ The memoranda and agreements executed at the conclusion of the 1977 negotiations with the Retail Clerks and the Meat Cutters set forth express terms with respect to the agreement between the employers and the unions to maintain the standard of wages, benefits and working conditions. There has been no showing of an oral or a written agreement among the employers explicitly stating the terms of a binding

8. Specifically, Borman's relies on Exhibit 6, the 1977 memorandum agreement between the Retail Clerks and USA; Exhibit 7, the signed USA-Retail Clerks 1977–1980 contract; Exhibit 8, the printed USA-Retail Clerks 1977–1980

contract; Exhibit 20, the 1977 memorandum agreement between the Meat Cutters and USA; and Exhibit 45, the printed USA-Meat Cutters 1977–1980 contract.

contract to pay identical wages and benefits to the Retail Clerks or the Meat Cutters.

### B.

Alternatively, Borman's argues that an implied-in-fact contract existed between itself, Allied and Chatham to pay identical wages and benefits to the Meat Cutters and the Retail Clerks throughout the term of the 1977 collective bargaining contracts. Borman's asserts that the following facts demonstrate the intention of itself, Allied and Chatham to be bound to each other with respect to providing uniform wages and benefits. First, USA had a history of consistently negotiating a common contract for its members providing for uniform wages and benefits. Second, Bushkin was employed as the sole spokesperson for USA. Third, USA negotiated contracts with the Meat Cutters and the Retail Clerks exclusively. Fourth, members of USA testified that the purpose of bargaining through USA was to obtain uniform wages and benefits and to avoid "whipsaw" union tactics.[9] Fifth, union ratification of the 1977 collective bargaining agreements was accomplished by vote aggregation. Sixth, the highly competitive and labor intensive nature of the Detroit supermarket business required identical wages and benefits. Seventh, James Hoffman, Labor Relations Director of Allied, made representations during the 1977 negotiations to the effect that USA members must agree upon mutually acceptable contract proposals as the parties would be bound for the term of the collective bargaining contracts. Eighth, representatives of the USA members testified that they would not have signed collective bargaining contracts which permitted other members to pay lower wages or benefits or which bound other employers for a shorter period of time.

A contract is implied-in-fact where the intention of the parties is not explicitly manifested, but may be implied or deduced from the language or conduct of the parties or other pertinent circumstances attending the transaction. *Miller v. Stevens,* 224 Mich. 626, 195 N.W. 481 (1923); *Erickson v. Goodell Oil Co., Inc.,* 384 Mich. 207, 212, 180 N.W.2d 798 (1970). A contract implied-in-fact arises from circumstances which, according to common understanding and an ordinary course of dealing, show a mutual intention to contract. *Schwartz v. Michigan Sugar,* 106 Mich.App. 471, 308 N.W.2d 459 (1981). The Court cannot find a contract absent the manifestation of such intent. *In Re Virginia Block Co.,* 16 B.R. 771 (Bkrtcy.W.D.Va.1982).

The Court does not find such a manifestation of intent in the evidence presented. It is undisputed that Allied, Borman's and Chatham engaged in collective bargaining with the Meat Cutters and Retail Clerks as members of a multi-employer bargaining group. It is similarly conceded that the purpose of multi-employer bargaining was the avoidance of whipsaw tactics and the attainment of uniform wages and benefits. Finally, it is accepted that the Detroit supermarket business is highly competitive and that uniform wages and benefits greatly contribute to continued economic viability of any given enterprise. The existence of the above facts, however, does not establish an intent by the parties to be irrevocably bound to each other to pay identical wages and benefits from 1977 through 1980.

**9.** As Chief Justice Burger has noted:

"Whipsawing" describes any one of several tactics by which a union creates a situation in which some but not all employers in a multiemployer group are closed or hampered by a strike or lockout. A union may call a strike against one or a few of the employers or, in the face of a lockout, it may negotiate a separate agreement with one or a few employers. Some of the employers are thus unable to conduct business as usual while others are fully operational. The theory behind whipsawing is that the impaired employers, seeing their competitors enjoying a market advantage and fearing that those competitors will increase their market share at the expense of the impaired employer, will be under irresistible pressure to yield to the union's demands.

*Charles D. Bonanno Linen Service, Inc. v. NLRB,* 454 U.S. 404, 421 n. 1, 102 S.Ct. 720, 721 n. 1, 70 L.Ed.2d 656 (1982) (Burger, C.J., dissenting).

The position of Bushkin as sole spokesperson and the manner and history of labor negotiations is as easily explained by the existence of the multi-employer group and by the bargaining demands of the union, as by the existence of an implied-in-fact contract. Similarly, the aggregation method of ratification is a matter solely within the province of the union. Further, the comments made by the participants to the negotiations, to the effect that the parties would "have to live with" the labor contracts, are more readily explained as a result of frustration with the bargaining process than as a manifestation of an intent to create a binding agreement. Finally, while it is presumably true that representatives of Borman's and Chatham would not have signed the 1977 collective bargaining contracts had they known that Allied would later obtain labor concessions, such "Monday morning quarterbacking" does not establish a mutual intent to contract in 1977.

Additionally, several factors negate the finding of an implied-in-fact contract. Foremost is the absence of a most favored nation clause in the 1977 collective bargaining contracts. Employers bargaining as members of a multi-employer group, seeking to prevent one of their members from obtaining changes to the union contract not available to the others, will generally include a most favored nation clause in the contract. The lack of such a clause in the 1977 collective bargaining contracts indicates that the members of USA did not intend to prohibit mid-contract negotiations.[10] Of similar import are the several unsuccessful attempts of Allied, Borman's, Chatham and others to formalize a multi-employer group to bargain with either the Retail Clerks, in 1974, or the Teamsters, in 1976. Several drafts of agreements prepared during 1974 and 1976, including the final 1976 draft, contained a provision permitting a signatory employer to modify a union contract previously entered into by the group, provided that notice was given. The provision permitting mid-contract modification was recognized as indicative of USA practice by a representative of Chatham.[11]

In summary, it is the view of this Court that the factual evidence presented by Borman's does not demonstrate an intent by the parties in 1977 to contract to pay identical wages and benefits to the Meat Cutters and the Retail Clerks throughout the term of the collective bargaining agreements, under every and all circumstances. The Court's inquiry is not completed, however, for the legal implications of the finding that Allied, Borman's and Chatham constituted a multi-employer bargaining unit, with corresponding rights and obligations, must also be examined.

### C.

In the prior Allied proceeding, the District Court found that Allied, Borman's and Chatham intended to be bound by group negotiations through USA. The Court stated:

> The testimony adduced in the proceedings before the bankruptcy judge satisfies the Court that Allied, Borman's and Chatham intended to be bound by group negotiations through the U.S.A. The Court therefore concludes that a multi-employer bargaining unit did exist here.
>
> That conclusion, of course, compels the further conclusion that Borman's, Chatham and Allied have mutual rights and obligations.

6 B.R. at 973 (footnote omitted).

In the present proceeding, Borman's relies on the language of the District Court opinion to argue that the existence of the multi-employer unit, in conjunction with the multi-employer nature of the collective bargaining agreements, creates an implied

---

10. The Court specifically notes the testimony of Mr. Theodore Kheel, an attorney specializing in labor relations, that the logical inference from the absence of a most favored nation clause is that the parties did not intend to prohibit mid-contract negotiations.

11. Mr. Weisberg, Vice-Chairman of Chatham, testified that the 1976 agreement signed by the five employers did not change the practices of USA or its members.

multi-lateral, multi-employer contract among the members of USA.

Multi-employer bargaining and multi-employer units are terms of art whose parameters are defined by federal labor law. Section 9(a) of the National Labor Relations Act (NLRA), 29 U.S.C. § 159(a), provides that employee bargaining representatives shall be selected by the majority of the employees in a unit appropriate for such purposes. Section 9(b) of the NLRA, 29 U.S.C. § 159(b), charges the National Labor Relations Board (NLRB) with the responsibility of determining the appropriate unit for purposes of collective bargaining. Although multi-employer bargaining is not specifically mentioned by the NLRA, bargaining between employer coalitions and large unions predates the NLRA and has expanded since its enactment.[12] The NLRB has the responsibility of certifying multi-employer units and regulating multi-employer bargaining. *See, NLRB v. Truck Drivers Union,* 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957) (*Buffalo Linen*); *Charles D. Bonanno Linen Service, Inc. v. NLRB,* 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982); *NLRB v. L.B. Priester & Sons,* 669 F.2d 355 (5th Cir.1982).

The prevalence of multi-employer bargaining is attributable to the advantages it offers employers and unions with respect to improved bargaining position, more reliable information on competitive conditions and the opportunity for less frequent and less costly negotiations. *Priester,* 669 F.2d at 360. Multi-employer bargaining also promotes industrial peace, a pronounced objective of national labor policy. 29 U.S.C. § 151; *Boys Markets, Inc. v. Retail Clerks Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Priester,* 669 F.2d at 360.

Consistent with its responsibility of regulating multi-employer bargaining, the NLRB has developed a test for determining whether a multi-employer unit exists. The NLRB will find a multi-employer unit where the individual employers have expressed an unequivocal intention to be bound in collective bargaining by group rather than individual action. *Frito-Lay, Inc. v. Local Union No. 137, International Brotherhood,* 623 F.2d 1354, 1358 (9th Cir. 1980), *cert. denied* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); *The Kroger Co.,* 148 N.L.R.B. 569 (1964). A NLRB determination that a multi-employer unit exists imposes on the employer a duty to bargain through the group association. An employer who engages in collective bargaining as part of a multi-employer unit and withdraws from the unit in an untimely manner commits an unfair labor practice. *See generally, Retail Associates,* 120 N.L.R.B. 388 (1958).[13]

The cases relied on by Borman's concern the unfair labor practice charges of unions and the issue of whether a multi-employer unit, and a corresponding bargaining duty, exists.[14] Similarly, the decision of the District Court concerns the question of whether Allied, Borman's and Chatham exhibited the requisite intent to support a finding of a multi-employer bargaining unit. The holding that Allied, Borman's and Chatham intended to be bound by group bargaining and thus constituted a multi-employer unit supports the conclusion that the members of USA had, under federal labor law, a duty to engage in group

---

**12.** The Supreme Court recently observed that 42% of major collective bargaining agreements are negotiated in multi-employer units. *See, Bonanno,* 454 U.S. at 410, n. 4, 102 S.Ct. at 724, n. 4.

**13.** *See also,* 29 U.S.C. § 158(a)(1)(5) which provides that it shall be an unfair labor practice for an employer to refuse to bargain collectively with the representative of his employees; 29 U.S.C. § 158(d) which defines "to bargain collectively"; and 29 U.S.C. § 158(b)(3) which provides that it shall be an unfair labor practice

for a labor organization to refuse to bargain collectively with an employer.

It is alleged that Borman's filed unfair labor charges against the unions in the present case which were dismissed by the NLRB.

**14.** *See e.g., Western States Regional Council No. 3 v. NLRB,* 398 F.2d 770, (D.C.Cir.1968); *Crane Sheet Metal, Inc. v. NLRB,* 675 F.2d 256 (10th Cir.1982); *NLRB v. Beckham, Inc.,* 564 F.2d 190 (5th Cir.1977).

bargaining. The finding does not necessarily support the conclusion that an enforceable multi-lateral contract existed among the employers.

The overriding concern of federal labor law is the encouragement of labor peace and stability through the process of collective bargaining. In furtherance of this policy, the NLRB has developed a test for finding a multi-employer unit and imposing a duty to bargain. The District Court relied on this precedent, and the bargaining history of the USA, to find that Allied, Borman's and Chatham considered themselves part of a multi-employer association bound by a group negotiator. Borman's requests that this Court apply this precedent, developed by the NLRB in encouragement of labor stability, to imply an enforceable, multi-lateral, multi-employer contract which would prohibit mid-contract negotiations with the union under all circumstances, including those where the union believed such negotiations to be in the best interests of its membership.[15] In the view of this Court, application of the authority cited by Borman's to find such an implied contract between parties of equal strength, engaged in arms-length bargaining, would be contrary to federal labor policy. Moreover, even assuming *arguendo* that the existence of a multi-employer unit were found to establish the existence of an implied, multilateral, multi-employer contract, the rights incident to that contract must necessarily include the right to withdraw.

### D.

In the prior proceeding, the District Court found that Borman's, Chatham and Allied had mutual rights and obligations resulting from the existence of the multi-employer unit. The District Court did not identify or define the nature and scope of those rights and obligations, except as they related to the rejection of the collective

bargaining agreement. The Sixth Circuit addressed the issue of the rights and obligations of the employers to each other arising from membership in the unit only by way of footnote, emphasizing that the "insubstantiality of Borman's interests in Allied's applications becomes even more apparent when one considers that Allied always retained a right to withdraw from the multiemployer bargaining unit without the approval of the other employer members." *Borman's,* 706 F.2d at 191, n. 9. The Sixth Circuit cited the cases of *Hotel and Restaurant Employees,* 240 N.L.R.B. 757 (1979), and *Spun-Jee Corp.,* 171 N.L.R.B. 557 (1968).

It has long been the ruling of the NLRB that prior to the commencement of negotiations for a new contract, and upon adequate notice, a party may freely withdraw from a multi-employer bargaining unit. After negotiations have begun withdrawal is permissible where the union consents or where the employer faces unusual circumstances such as economic hardship. *Retail Associates,* 120 N.L.R.B. at 394–395.

The cases cited by the Sixth Circuit exemplify this rule. In *Spun-Jee Corp.,* the NLRB held that an employer's withdrawal from a multi-employer association, after the commencement of association-wide negotiations, was justified by "evident economic hardship" inherent in the employer's continuance in business.[16] In *Hotel and Restaurant Employees,* the NLRB held that the union committed an unfair labor practice by insisting that the employer execute and abide by the terms of a collective bargaining agreement between the union and the other members of a multi-employer association, where the union had previously consented to the employer's mid-negotiation withdrawal and acquiesced in the employ-

---

**15.** The Retail Clerks and the Meat Cutters not only consented to Allied's rejection of the collective bargaining contracts, they also filed a brief as *amici curiae* in support of Allied's position in the proceedings before the Sixth Circuit.

**16.** *See also, U.S. Lingerie Corp.,* 170 N.L.R.B. 750 (1968) (Allowing an employer which had filed a bankruptcy reorganization petition to withdraw from multi-employer bargaining after negotiations were underway).

er's request to bargain apart from the multi-employer unit.[17]

 The right to withdraw, upon a showing of consent or unusual circumstances, is thus incident to membership in a multi-employer unit. Allied, in the prior proceeding, established both union consent and financial hardship constituting unusual circumstances.[18] Allied therefore possessed, at all times relevant hereto, the right to withdraw from the multi-employer bargaining unit.[19]

### VI.

In summary, it is the ruling of this Court that the 1977 memoranda and the resulting collective bargaining agreements with the Meat Cutters and the Retail Clerks do not constitute an express contract among Allied, Borman's and Chatham. It is further the conclusion of the Court that Borman's has failed to show that an implied-in-fact contract existed among itself, Allied and Chatham to pay identical wages and benefits to the Meat Cutters and the Retail Clerks, throughout the term of the collective bargaining agreements. Having determined that no contract bound Allied to refrain from modifying the terms of the labor agreements with the unions, without the other employers' consent, the Court need not reach the defenses raised by Allied.

The objection of Allied is sustained; the claim of Borman's is disallowed.

So ordered.

17. The only relevant departure by the NLRB from the rule occurred in *Teamsters Union Local No. 378 (Olympia Automobile Dealers),* 243 N.L.R.B. 1086 (1979), *remanded* 672 F.2d 741 (9th Cir.1982). In *Olympia Automobile Dealers* the NLRB concluded that the consent of other employers in the unit, as well as the union's, is necessary before it will sanction a withdrawal after the start of contract talks. On the petition of the NLRB for enforcement, however, the Ninth Circuit remanded for findings regarding the existence of an agreement among the association's employer members. The Court reasoned that such an agreement "is an expression of the degree to which an employer is bound by the contracts negotiated by the unit, and the magnitude of the other employers' interest in maintaining the stability, solidarity, and integrity of the unit." 672 F.2d at 744.

As Allied fits the unusual circumstances exception, the ruling of the NLRB requiring membership consent before an employer may withdraw from a multi-employer bargaining group is not applicable. However, the reasoning of the Ninth Circuit that a multi-employer agreement is an expression of the degree to which an employer is bound is persuasive.

18. *See e.g., Borman's,* 706 F.2d at 191, n. 9.

19. Although the cases of *Spun-Jee Corp.* and *Hotel and Restaurant Employees,* cited by the Sixth Circuit in support of its conclusion that Allied had a right to withdraw, involved withdrawals during negotiations case law exists upholding employer withdrawals after the close of negotiations. *See, Priester,* 669 F.2d 355.