563 F.2d 366
 96 L.R.R.M. (BNA) 2613, 82 Lab.Cas. P 10,170
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Sheet Metal Workers International Association, Local No. 3,
Intervenor-Petitioner,
v.
SIEBLER HEATING & AIR CONDITIONING, INC., Interstate Sheet
Metal, Inc., Donovan Brothers, Inc., Schneiderwind Heating &
Air Conditioning Co., Walt Coziahr Heating & Air
Conditioning Co., Fisher Heating & Air Conditioning Co.,
Nelson Heating & Air Conditioning Co., Roberts Sheet Metal
Co., and Frazier-Schurkamp, Inc., Respondents.
 No. 76-2125.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 15, 1977.
Decided Oct. 11, 1977.
 
 W. Christian Schumann, Atty., N.L.R.B., Washington, D. C., Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., for petitioner; John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel and Marion Griffin, Atty., N.L.R.B., Washington, D. C., on brief.
 Soren S. Jensen, Swarr, May, Smith & Andersen, Omaha, Neb., for respondents.
 Soren S. Jensen and George C. Rozmarin, Swarr, May, Smith & Andersen, Omaha, Neb., for respondents except Fisher.
 David D. Weinberg, Weinberg & Weinberg, P. S., Omaha, Neb., for intervenor.
 Before GIBSON, Chief Judge, and HEANEY and STEPHENSON, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 The principal issue raised in this enforcement proceeding is whether the National Labor Relations Board's finding that each respondent, other than Frazier-Schurkamp, violated § 8(a)(5) and (1) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq., by making an untimely withdrawal from a multi-employer bargaining unit, can be sustained. The resolution of this issue depends on whether unusual circumstances justified the respondents' withdrawal after negotiations had begun. The Board found that no unusual circumstances existed. We disagree with this conclusion and deny enforcement of the Board's order.
 
 
 2
 The essential facts are not disputed. The respondents are heating, air conditioning and sheet metal contractors concentrating on residential work. For a number of years prior to 1973, they were all members of the Sheet Metal and Air Conditioning Contractors' National Association of Omaha-Council Bluffs (SMACNA), a multi-employer association to which most of the area's contractors belong. During these years, SMACNA represented respondents along with its other members in multi-employer collective bargaining with the Sheet Metal Workers' International Association, Local No. 3. From 1969 to 1974, Don Siebler, a respondent, was president of SMACNA. He was also a member of its board of directors and its negotiating committee.
 
 
 3
 In 1972, SMACNA and the Union negotiated and executed a collective bargaining contract effective from July 1, 1972, to June 30, 1973. The contract included a so-called "Residential Addendum." It provided that journeymen sheet metal employees doing residential work would be paid ninety-six percent of the regular journeyman rate. Residential work, as defined, included work on single-family dwellings, apartments and condominiums.
 
 
 4
 In 1973, Frazier-Schurkamp, one of the respondents, made a timely withdrawal from SMACNA. It then negotiated and executed a collective bargaining contract with the Union on a single-employer basis. All of the other respondents remained members of SMACNA. They authorized it to continue representing them in bargaining with the Union on a multi-employer basis. Thereafter, SMACNA and the Union negotiated and executed a new collective bargaining contract. It was to remain in effect from July 1, 1973, to June 30, 1974, and from year-to-year thereafter unless reopened by the parties. The 1973-1974 contract, unlike the 1972-1973 contract, did not include a Residential Addendum. The Addendum was omitted because the parties could not agree on its terms. However, the Union assured SMACNA that it would take a "long hard look at the residential situation in the Omaha-Council Bluffs area and try to work out something to make (respondents) more competitive with the non-union element in (the) area."
 
 
 5
 In January of 1974, a representative of the International Union came to Omaha to study residential contracting and to draft a new Residential Addendum. He discussed the problem with SMACNA representatives and then told them that he would meet with the Union's executive committee and return with a proposal for a new Addendum.
 
 
 6
 On February 12, 1974, the representative of the International met with SMACNA representatives, including Siebler, to discuss the proposed Residential Addendum. The proposed Addendum established a lower rate for residential installers of seventy-five percent of the regular journeyman's rate. The rate would be applicable only to single-family dwellings. The Union stated that it would secure persons to work in this classification from non-union shops in the Omaha area and would refer such persons to employers through the Union hiring hall. The employers would have the right to reject anyone referred as unqualified. The Addendum provided that no existing journeyman or apprentices would be replaced by a lower-rated residential installer.
 
 
 7
 On February 14, the Union again met with SMACNA representatives. SMACNA suggested two minor changes to the proposed Addendum. The Union accepted them. The Addendum was subsequently approved by SMACNA's membership and was signed on April 1, 1974. It was effective, by its terms, from April 1, 1974, to March 31, 1977.
 
 
 8
 Between January 15 and March 19 of 1975, five of the respondents sent SMACNA signed letters authorizing SMACNA to represent them in renegotiating the 1973-1974 contract on a multi-employer basis. They agreed to be bound by any contract resulting from such negotiations.
 
 
 9
 On March 22, the Union gave SMACNA and each of the respondents timely notice that it wished to renegotiate the 1973-1974 contract. On March 26, SMACNA notified the Union that SMACNA's members agreed to such renegotiation. Shortly thereafter, SMACNA and the Union agreed to begin negotiations on April 2.
 
 
 10
 On April 1, Siebler met with SMACNA's leaders to discuss a revised Residential Addendum. Siebler stated that if there was an understanding that the recently negotiated Residential Addendum would be open for renegotiation, he would give SMACNA a bargaining authorization letter and would serve on SMACNA's negotiating committee. SMACNA leaders agreed to this condition. Siebler gave SMACNA a bargaining letter, accepted appointment to the negotiating committee and signed a copy of the new Addendum.
 
 
 11
 On April 2, SMACNA and the Union began renegotiating the 1973-1974 contract. SMACNA's negotiating committee included Siebler. During the session, SMACNA proposed that the existing Residential Addendum be renegotiated. The Union responded that it was not willing to change the recently negotiated Addendum.
 
 
 12
 Between April 2 and April 9, Robert Hooker, a SMACNA official, prepared a "black book" listing the objectives of SMACNA's negotiating committee. Included was an amended Residential Addendum extending the residential rate to condominiums and apartments and a Service Addendum extending the lower rate to service work.
 
 
 13
 On April 9, SMACNA and the Union held a second negotiating session. During the session, SMACNA did not propose the amended Residential Addendum or the Service Addendum. After the session, Siebler complained about this fact to SMACNA's negotiating committee. Siebler stated that he would rather terminate the existing contract so "the commercial contractors would sign their contract and the residential contractors would be off the hook and negotiate their own contract." Don Olson responded that SMACNA's members should stay united. Siebler then protested that SMACNA's members could not solve anything together. Olson replied that he "wasn't sure (they) could and wasn't sure (they) couldn't." Finally, Olson stated that he would "let the majority rule" on the residential work issue.
 
 
 14
 On April 10, a luncheon meeting was held to consider an "air conditioning code." After that matter was discussed, a leader of the employers engaged in commercial and industrial work said he would give the Union "85 cents an hour and just leave the contract as is and forget anything else." Other commercial and industrial contractors said, "Amen." Siebler was present when the statement was made.
 
 
 15
 On April 16, SMACNA and the Union held a third negotiating session. At this session, as at the April 9 session, SMACNA did not propose the amended Residential or Service Addendum.
 
 
 16
 On April 22, SMACNA's members met to consider the residential work issue. During the meeting, Siebler, seeking to firm up the respondents' position, introduced a resolution proposing that SMACNA sign no contract with the Union unless it contained "without change or substitution" two provisions: an amended Residential Addendum extending the existing Addendum's seventy-five percent wage rate to residential work on condominiums and apartments, and a Service Addendum extending the same seventy-five percent rate to service work. After extensive discussion, SMACNA's members rejected Siebler's resolution and instead passed a resolution that SMACNA's negotiating committee "make every effort to secure a workable Residential Addendum."
 
 
 17
 On April 23, Siebler called several residential contractors and asked if they "wanted to take some action on behalf of that Residential Addendum." Most replied in the affirmative. Siebler and the others decided to withdraw from SMACNA and seek to negotiate a contract with the Union on their own.
 
 
 18
 On the same date, SMACNA and the Union held a forth negotiating session. At this session, the Union was informed by letter that SMACNA no longer represented six of the residential contractors in collective bargaining because SMACNA had failed to provide them with fair representation. The Union was also informed that the six would observe the terms of the 1973-1974 contract until new contract terms were negotiated. They urged the Union to arrange negotiations with them as quickly as possible. The Union replied that the residential contractors were part of the established multi-employer bargaining unit and that the negotiations in that unit should proceed. The six were subsequently joined by three other contractors. All nine were named as respondents.
 
 
 19
 On May 5, the Union received a letter from certain of the respondents stating that they had withdrawn from SMACNA because "their interest in residential work was not being fairly protected by SMACNA" and they were willing to negotiate with the Union as a separate group.
 
 
 20
 In early May, SMACNA and the Union held four more negotiating sessions. On May 14, SMACNA and the Union reached agreement on a new collective bargaining contract effective from July 1, 1974, through June 30, 1977.
 
 
 21
 On May 23, the respondents advised the Union that each residential contractor formerly represented by SMACNA was now represented by a new multi-employer association, Metropolitan Contractors Association. The Union was asked to meet with the association to negotiate a collective bargaining agreement. The respondents committed themselves to granting the same general wage increase as SMACNA.
 
 
 22
 On June 3, the Union sent each respondent a letter announcing the SMACNA and the Union had reached agreement on a new contract. Each letter included a copy of the contract. The letter asserted that the respondents did not make a timely withdrawal from the negotiations between SMACNA and the Union, and were, thus, bound by the new contract. The letter warned that if the respondents did not sign the contract within a week, the Union would consider them in violation of the Act.
 
 
 23
 On June 21, Siebler announced to his employees that if the Union did not negotiate with Metropolitan Contractors Association, there would be a lockout on July 1. In keeping with this announcement, each respondent locked out its sheet metal employees on that date.
 
 
 24
 On July 9, the respondents called off the lockout. They again stated that they would not sign the new contract negotiated with the Union by SMACNA. The same day, the Union advised them that the respondents' employees were willing to return to work. The Union repeated its position that the respondents were bound by the SMACNA contract.
 
 
 25
 On July 10, all of the respondents' sheet metal employees returned to work. Many were thereafter paid only seventy-five percent of the regular journeyman rate when doing any residential work on single-family dwellings, duplexes, condominiums or apartments.
 
 
 26
 On the basis of these facts, the Board found that a multi-employer bargaining unit existed and that negotiations for a new collective bargaining agreement were instituted prior to the respondents' attempt to withdraw from the unit. These findings are supported by substantial evidence on the record as a whole. The respondents do not challenge them. See N.L.R.B. v. Truck Drivers Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957); N.L.R.B. v. Central Plumbing Co., 492 F.2d 1252 (6th Cir. 1974); N.L.R.B. v. Tulsa Sheet Metal Work, Inc., 367 F.2d 55 (10th Cir. 1966); Retail Associates, Inc., 120 N.L.R.B. 388, 42 LRRM 1119 (1958).
 
 
 27
 The Board also found that no unusual circumstances existed to justify respondents' withdrawal when they did. In our judgment, the Board's findings cannot be sustained.
 
 
 28
 The record clearly shows that non-union contractors were taking an increasingly large share of all sheet metal work on residential properties. The respondents were anxious to solve this problem in a way that would permit them to retain a sufficient share of the available area work to continue in business. They were willing to work with the Union to accomplish that purpose. The problem was not an easy one to solve. The Union wanted to retain the work for its members. It was, however, difficult to administer the program and maintain harmony within the Union because all Union members were more interested in working at the higher scale being paid to those who worked on commercial and industrial projects. Moreover, those who worked steadily at the higher wage level were not eager to make any sacrifices for their less fortunate brothers.
 
 
 29
 Various attempts were made to solve the problem within the framework of the multi-employer bargaining unit. The first effort to solve the problem in the 1972 agreement floundered on the shoals of employee dissatisfaction. The second effort, initiated in 1973 and formalized in early 1974, failed because the plan advanced by the Union did not provide relief for the respondents engaged in building apartments and condominiums. Non-union contractors continued to get those jobs.
 
 
 30
 The third effort was undertaken as the 1974 negotiations approached. The respondents agreed to participate in the collective bargaining agreement if SMACNA would work with them in achieving their goal of extending the seventy-five percent minimum wage rate for condominiums and apartments and to extend the wage rate to service work as well. SMACNA agreed to this goal and listed it as one of its objectives in the contract negotiations.
 
 
 31
 The negotiating committee raised the issue at the first meeting on April 2, 1974. However, it did not raise it at the second meeting on April 9, or at the third meeting on April 16. This failure, coupled with the April 10 statement by members of the negotiating committee representing commercial and industrial installers that they would settle for an eighty-five cents an hour increase and forget all other issues, made it crystal clear to the residential contractors that the majority was unwilling to engage in any tough bargaining to obtain a meaningful Residential Addendum. The plain implication was that the majority felt they might have to pay more than the eighty-five cents if they continued to insist on a better deal for respondents. Under these circumstances, the respondents had only two alternatives: withdraw promptly and decisively, which they did; or continue to lose business to non-union contractors or non-union employees.
 
 
 32
 We recognize that dissatisfaction with the results of group bargaining does not justify an untimely withdrawal. N.L.R.B. v. Central Plumbing Co., supra; N.L.R.B. v. Tulsa Sheet Metal Works, Inc., supra. We also understand that an employer cannot remain in a multi-employer unit as long as he believes it is to his advantage to do so and then withdraw when he concludes he can do better by himself. N.L.R.B. v. Associated Shower Door Co., Inc., 512 F.2d 230 (9th Cir.), cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975). But an employer or group of employers has a right to expect that his or their interests will be fairly represented in negotiations and that their interests will not be totally sacrificed in the interests of the majority. Here, notwithstanding a commitment by the majority that the respondents' interests would be represented fairly, the majority made only a feeble effort to protect the respondents' interests and threw in the towel at the first sign of opposition. See N.L.R.B. v. Unelko Corp., 478 F.2d 1404 (7th Cir. 1973). Cf. Fairmont Foods Company v. N.L.R.B., 471 F.2d 1170 (8th Cir. 1972); Atlas Electrical Svc. Co., 176 N.L.R.B. No. 110, 71 LRRM 1625 (1969); U. S. Lingerie Corp., 170 N.L.R.B. No. 77, 67 LRRM 1482 (1968). They did so because they believed their best interests would be served by giving an eighty-five cents per hour increase and leaving the remainder of the contract as is.
 
 
 33
 The Board makes much of the fact that the respondents insisted on an all or nothing solution to the problem by proposing a resolution to that effect at the April 22 SMACNA meeting. However, the record as a whole clearly shows that the resolution was intended only to stiffen the spine of the majority and to make the point that some sacrifice would have to be made by both commercial and industrial contractors if the multi-employer bargaining unit was to be maintained. The majority rejected this approach in favor of one which would provide the best contract for themselves.
 
 
 34
 The Board also emphasizes that a three-year Residential Addendum was negotiated in the Spring of 1974 and purported to bind the parties for three years. Ordinarily, this fact would be persuasive; but here, the majority agreed that the Addendum could be opened with the rest of the contract. While the Union protested that interpretation, it made no effort to have this issue submitted to arbitration. Moreover, the Board did not base its order on a clear finding that the Addendum was in fact binding for a three-year period.
 
 
 35
 The Board also claims that withdrawal was not justified here because the respondents' economic distress was not so severe as to threaten their economic survival. While we do not view this as the principal grounds for withdrawal, the record reveals that non-union employers were getting a larger and larger share of the available residential work and genuine economic distress was only a step removed.
 
 
 36
 This Court recognizes that multi-employer bargaining is a vital factor in effectuating a national policy of promoting labor peace through strengthened labor bargaining. But multi-employer bargaining will work only when the interests of all parties to the bargaining are fairly represented. That was not done here.
 
 
 37
 Enforcement denied.