**CARPENTERS LOCAL 1471 and Mississippi Carpenters & Operating Engineers Benefit Plan, Plaintiffs,**

v.

**BAR–CON, INC., Defendant.**

**Civ. A. J85–0924(L).**

United States District Court,
S.D. Mississippi,
Jackson Division.

May 16, 1987.

---

**562**

John L. Quinn, Cupit & Maxey, Jackson, Miss., for plaintiffs.

David L. Reynolds, Reynolds, Prewitt & Bradley, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

TOM S. LEE, District Judge.

This cause is before the court for decision on joint stipulation of facts submitted by the plaintiffs, Carpenters Local 1471 and Mississippi Carpenters & Operating Engineers Benefit Plan (collectively the Union), and the defendant, Bar-Con, Inc. Plaintiffs brought this action against Bar-Con under section 301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 158 (1973), and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. (1985).[1] The Union seeks an audit and accounting pursuant to section 10.66 of the parties' collective bargaining agreement (CBA), an order enjoining future breach of the CBA, back pay and delinquent contributions, together with interest, liquidated damages, costs and attorney fees as provided for in the CBA and the trust agreement.[2] Bar-Con has filed a counterclaim for reimburse-ment from the Union for overpayments made by Bar-Con into individual retirement accounts of union members employed by Bar-Con. The relevant facts, as stipulated by the parties, will be briefly summarized.

Bar-Con is an employer in the construction business. Carpenters Local 1471 is a labor organization which represents employees in the construction industry within its craft jurisdiction, as set forth in its CBA; the Mississippi Carpenters and Operating Engineers Benefit Plan is a jointly trusteed benefit plan which administers, *inter alia*, the Health & Welfare Benefit Plan for carpenters working within the jurisdiction of Local 1471. Bar-Con's collective bargaining relationship with the Union arose in September 1972 through Bar-Con's participation in a multiemployer bargaining unit, Associated General Contractors of Mississippi, Inc. (AGC). At that time, Bar-Con executed a letter of assent with the Union, by which Bar-Con agreed to operate under the provisions of a master CBA then in existence between the Jackson Building & Construction Trades Council and the Associated Building Contractors of Mississippi, Inc.[3]

Southwest Administrators, the benefit plan administrator,[4] was responsible for managing the reporting forms from various employers, including Bar-Con, for all fringe benefit funds provided for pursuant to the CBA and governed by the trust agreement. In July 1982, a new fringe benefit, a savings and retirement fund, was added to the CBA between Bar-Con and the Union. This benefit provision was negoti-

---

1. Although the Union's complaint does not specify the sections of ERISA upon which the suit is based, the authorization for suit for delinquent contributions is found at section 515, 29 U.S.C. § 1145.

2. To administer the fringe benefits provided for under ERISA, the Associated General Contractors of Mississippi, Bar-Con's representative, and the Building and Construction Trades Council established jointly a trusteed benefit plan. The trust agreement governs the administration of the plan by a board of trustees whose membership consists both of union and employer representatives.

3. By amendment to its Articles of Incorporation dated January 3, 1973, filed with the Secretary of State on February 1, 1973, the Associated

Building Contractors of Mississippi, Inc. changed its name to the Associated General Contractors of Mississippi, Inc. The Jackson Building & Construction Trades Council changed its name to the Central Mississippi Building & Construction Trades Council on November 1, 1976. These were changes in name only as the parties continued thereafter to serve in their same capacities.

4. Since January 1, 1985, Southwest Administrators has also served as a depository for employer and employee contributions to fringe benefit funds. Prior to that date this service was provided by Security Savings & Loan.

ated as an amendment to the CBA which ran from July 1, 1982 through April 30, 1983. The retirement plan was to be funded by employee contributions; the employer's sole responsibility was to deduct the appropriate amounts for the fund from employee paychecks and forward those monies to Southwest Administrators. However, Bar-Con, under the erroneous belief that the plan was employer funded, made full payments on behalf of its employees to the administrator of the fund until February of 1985. Upon discovering its error, Bar-Con stopped making fringe benefit contributions on behalf of its employees.

On April 15, 1985, Bar-Con ceased operating under the terms and conditions of the parties' CBA, and has continued to do so. At that time, Bar-Con attempted to terminate its association with the Union by letter from its Chief Executive Officer, Connelly Plunkett, dated April 15, 1985. The parties agree, though, that Bar-Con did not send the notice of termination to the correct party, the Union, at the correct address until April 10, 1986. That notice, however, was untimely under the termination provisions of both the letter of assent and the CBA. According to plaintiffs, to date, there has still been no proper or timely notice of termination.

The plaintiffs contend that, inasmuch as Bar-Con has failed to effectively terminate its obligations under the CBA, Bar-Con is liable for back pay from April 1985 and delinquent contributions from February 1985 to date. To determine the correct amount of back pay and delinquent contributions, plaintiffs seek an order allowing an audit and accounting pursuant to section 10.66 of the CBA.[5]

Bar-Con first asserts that it is not liable to the Union for back pay and past due contributions since the Union failed to properly notify Bar-Con of the employee contributing aspect of the fund. That is, Bar-Con contends that the Union failed to furnish copies of the CBA and the amendment regarding funding of the plan or to otherwise inform Bar-Con that the plan was employee funded and that such failure was a material breach of the CBA and letter of assent which entitled Bar-Con to rescind the agreement. The court notes that there is nothing in the CBA which imposes upon the Union a duty to supply information to the members of the multiemployer bargaining unit with which it deals.[6] Nevertheless, Bar-Con was routinely provided with information by the Union, including at least some copies of the CBAs. Bar-Con had access to copies of all the CBAs from either the Union or AGC, and no request by Bar-Con for documents or other information was ever denied.

The parties agree that Bar-Con did not have a copy of the CBA and that the Union never provided Bar-Con with a copy of the CBA provisions regarding the funding of employee savings and retirement accounts, which clearly indicated they were employee funded rather than employer funded.[7] Bar-Con was advised by letter from Southwest Administrators dated July 28, 1982 that the fund had been established. However, no one at Bar-Con requested a copy of the contract from Southwest Administrators or the plaintiffs, or asked Jack Wynne, the Union's business representative, about the funding for the employee retirement plan prior to the discovery by Bar-Con in February 1985 of its error in funding this benefit plan.

---

**5.** Section 10.66 provides in pertinent part that, [T]he Board of Trustees of the ... funds shall have the right to have a Certified Public Accountant examine and audit the payroll records of contractors signatory hereto at any reasonable time for the purpose of verifying the accuracy and correctness of said contractors' contributions.

In September 1985, plaintiff requested an audit, but Bar-Con declined the request and has continued to do so.

**6.** Bar-Con's representative in the collective bargaining relationship is ACG; if any party might have a duty to supply copies of the current CBA, it would be the entity which bargains on Bar-Con's behalf.

**7.** This CBA, as amended, was extended for a period of one year by agreement of the Employers Association and the Building Trades Unions. On May 1, 1984, a successor CBA became effective which incorporated the savings and retirement account provision as Article 10.414.

This court cannot accept Bar-Con's contention that it has a state common law right to repudiate its obligations under the letter of assent and the CBA. It is a fundamental rule of the law of labor relations that the substantive law for construing disputes under the federal labor statutes arises from federal common law. *See Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). "Federal interpretation of the federal law will govern, not state law." *Id.* State law may be resorted to only if there is no federal statute which expressly addresses the issue and the state rule employed would effectuate the federal policy underlying the statute in question. *Id.; see also Nachwalter v. Christie,* 805 F.2d 956–59 (11th Cir.1986). In the context of multiemployer bargaining units, the United States Supreme Court has recognized the federal statutory scheme as creating a system which

> neither forces employers into multiemployer units nor erects barriers to withdrawal prior to bargaining. At the same time, it [the National Labor Relations Board] has sought to further the utility of multiemployer bargaining as an instrument of labor peace by limiting the circumstances under which any party may unilaterally withdraw during negotiations.

*Charles D. Bonanno Linen Service v. NLRB,* 454 U.S. 404, 412, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982). Granting employers the traditional state contract law right of repudiating a contract for material breach would undermine the stability and utility of multiemployer bargaining units. It would be particularly inappropriate to do so in a case such as this where there is no evidence of any contractual duty on the part of the Union to supply Bar-Con with information, and where it is clear that Bar-Con could have readily obtained the desired information from the Union, Southwest Administrators or AGC.

Bar-Con next argues that the doctrine of unusual circumstances justifies its untimely termination of the agreement with the Union. Generally, an employer may withdraw from a multiemployer bargaining unit and thereby end its obligations to a union only upon timely and proper notice. But untimely withdrawal is allowed where the parties mutually consent, or where there exist unusual circumstances which would justify unilateral withdrawal from a multiemployer bargaining unit without timely notice. *Charles D. Bonanno Linen,* 454 U.S. at 411, 102 S.Ct. at 724. In *Charles D. Bonanno Linen,* the employer sought to withdraw during the course of negotiations with the union. The reason given by the employer for the withdrawal was that an impasse had been reached in bargaining. *Charles D. Bonanno Linen,* 454 U.S. at 407–08, 102 S.Ct. at 722–23. The Supreme Court, in discussing whether this reason for withdrawal was within the unusual circumstances exception, stated that the National Labor Relations Board had found unusual circumstances only where "an employer is subject to extreme financial pressures or where the bargaining unit has become substantially fragmented." *Id.* at 411, 102 S.Ct. at 724. The Court concluded that a bargaining impasse was not an unusual circumstance sufficient to justify unilateral withdrawal by a union or by an employer. *Id.* at 416, 102 S.Ct. at 727.

In the case at bar, there is no suggestion that the bargaining unit was substantially fragmented. With reference to the question of financial difficulty, Bar-Con's chief executive officer did say in his deposition that it would be "unprofitable" to continue the relationship with the Union. The court is of the opinion that this statement does not demonstrate extreme economic pressure such as would justify Bar-Con's untimely withdrawal from the multiemployer bargaining unit. *See N.L.R.B. v. L.B. Priester & Son, Inc.,* 669 F.2d 355, 362 (5th Cir.1982) (employer bears burden of demonstrating gravity of economic condition); *see also N.L.R.B. v. Siebler Heating and Air Conditioning, Inc.,* 563 F.2d 366, 371 (8th Cir.1977) (recognizing genuine economic distress as justification for untimely withdrawal); *N.L.R.B. v. Spun-jee Corp.,* 385 F.2d 379, 382 (2nd Cir.1967) (crisis such as employer's decision to close

business for economic reasons sufficient unusual circumstances). It is reasonable to infer that Bar-Con's withdrawal from the multiemployer unit was prompted by its discovery that it had been erroneously funding the savings and retirement accounts and subsequently learning from Southwest Administrators that the funds could not be returned without the consent of the individual employees who held those individual retirement accounts. Consequently, the court concludes that there are no unusual circumstances which excuse Bar-Con's untimely withdrawal.[8]

In a further attempt to to justify its withdrawal from the multiemployer bargaining unit, Bar-Con relies on cases which have held that where employees are denied benefits because they were not notified of changes in ERISA plans by trustees of those plans, the employees should be allowed to recover benefits. Bar-Con maintains that it should receive the same equitable consideration as those employees received since it was not notified that the retirement fund was to be employee funded. However, in the cases relied on by Bar-Con, the employees' right to recover for the trustees' failure to give notice was based upon express statutory provisions [9] and the existence of a fiduciary relationship between the trustees and the employees. *See Pompano v. Michael Schiavone & Sons, Inc.*, 680 F.2d 911 (2nd Cir.1982); *Kosty v. Lewis*, 319 F.2d 744 (D.C.Cir. 1963). In contrast, Bar-Con and the Union had an arms-length bargaining relationship and neither was a fiduciary for the other. Consequently, Bar-Con is not entitled to the same protection afforded employees for failure to receive notice.

Finally, Bar-Con asserts that the termination clause of the letter of assent was ambiguous in that it was not clear when or how its collective bargaining obligations could be terminated.[10] The termination clause in the letter of assent provides as follows:

> This Letter of Assent shall remain in effect for the term stated in the Collective Bargaining Agreement, attached hereto, or any renewal thereof, unless one party to this Letter of Assent gives prior written notice of the intent to terminate this Letter of Assent to the other not less than sixty nor more than seventy-five days before the expiration date of the attached collective bargaining agreement or the anniversary date of this Letter of Assent, whichever should occur first.

The CBA in effect at the time of Bar-Con's attempted termination on April 15, 1985 provided that,

> This agreement shall go into effect the first day of May, 1984, and shall remain in full force and effect through the 30th day of April, 1985, and shall thereafter continue in effect from year to year unless either party shall express a desire for a change, by notice in writing, to the other party at least sixty days prior to the April 30, 1985 termination date.

The listed signatory for the Union on both documents is Carpenters Local Union No. 1471. The parties have stipulated that no notice of termination was directed to the Union or mailed to its correct address until April 10, 1986. Hence, clearly, no notice prior to April 1986 was effective to terminate the parties' collective bargaining obligations. It is further stipulated that the April 1986 letter, although addressed and

---

**8.** Bar-Con takes the position that the termination clauses of the CBA and letter of assent are ambiguous such that it was unclear as to when Bar-Con could effectively terminate its obligations to plaintiffs. This ambiguity, according to Bar-Con, provides the basis for this court's recognition of an unusual circumstances exception. However, as will be seen *infra*, the court does not accept Bar-Con's ambiguity defense and, consequently, this argument is without merit.

**9.** *See* 29 U.S.C. § 1132 and 29 U.S.C. § 1133.

**10.** A contract is ambiguous "when it is reasonably susceptible to more than one meaning, in light of surrounding circumstances and established rules of construction." *Northshore Laboratories Corp. v. Cohen*, 721 F.2d 514, 519 (5th Cir.1983). Whether a document is ambiguous is a question of law. *Paragon Resources v. National Fuel Gas Distribution Corp.*, 695 F.2d 991, 995 (5th Cir.1983).

sent to the correct party, was not timely under the terms of either the letter of assent or the CBA.[11]

■ The court first notes that a letter of assent such as that executed by Bar-Con operates to bind signatories to the terms of a master collective bargaining agreement until timely and proper termination. It represents a continuing delegation of bargaining rights by an employer to the multiemployer bargaining representative, and binds signatories not only to the remainder of the term of the collective bargaining agreement then in existence, but also to successor agreements negotiated between unions and employer associations, subject to the right of the individual employer to opt out of the multiemployer bargaining and engage in individual bargaining. *See N.L.R.B. v. Rayel Elec. Co.*, 709 F.2d 939 (5th Cir.1983); *Ted Hicks & Associates, Inc. v. N.L.R.B.*, 572 F.2d 1024 (5th Cir. 1978).

The CBA itself is related to, but separate from the letter of assent. It obligated Bar-Con to maintain specific wages, benefits, hours and terms and conditions of employment for the duration of the agreement. The CBA itself could be terminated by the giving of timely notice pursuant to the CBA's terms, and if not terminated, then the CBA would be automatically renewed for successive one-year periods. The CBA and letter of assent are separate agreements, which are intended to perform different functions. The only obligations imposed by the letter of assent are the commitment to abide by the existing CBA as of the date of execution of the letter of assent for the remainder of the term of the CBA then in effect and an agreement to abide by successor agreements *unless* the authorization created by the letter of assent, allowing the AGC to negotiate successor agreements on behalf of Bar-Con, is cancelled.

The termination clause in the letter of assent specifically refers to two dates which may serve as a reference for termination of the letter of assent, and make operative whichever date occurs first. The first of these two dates is the termination date specified in the CBA itself; the second is the anniversary date of the letter of assent.[12]

Considering the language of the CBA and the letter of assent, together with the nature of those agreements, the court is of the opinion that there exists no ambiguity regarding the appropriate time for termination of either or both agreements. If, as Bar-Con apparently contends, the phrase "whichever should occur first" refers to whichever next follows the date of the signing of the letter of assent, and not whichever comes first in the calendar year, it is evident that, given the fact that each CBA is effective for a period of one year, the termination date of the CBA will always be first to occur after the signing date. Thus, the inclusion of any reference to the anniversary date would be meaningless. Therefore, the court concludes that this construction is simply not tenable, and the only reasonable construction is that the

---

**11.** The parties disagree as to who drafted the letter of assent. The Union claims that it was drafted by the contractor's association. Bar-Con asserts that the letter of assent was drafted by the Union. Though the parties have not offered any documentary evidence to support their respective contentions, the resolution of that issue is not essential to the resolution of this case. In *NLRB v. L.B. Priester & Son, Inc.*, 669 F.2d 355, 364 (5th Cir.1982), the employer argued that a provision over which there was a dispute should have been construed against the Union which drafted the agreement. The Fifth Circuit stated that collective bargaining agreements were not governed by the common law concepts which control private contracts. Even if the maxim of construction were controlling with regard to collective bargaining agreements, the court declined to apply it because contracts are to be construed only against the drafter as a matter of last resort when doubt remains after applying the ordinary processes of interpretation. Construing a contract against the drafter "does not serve as an alternative to construing a contract as the parties intended it." *Id.*

**12.** The alternative periods within which notice must be given in order to terminate are sixty to seventy-five days prior to the expiration date of the CBA and sixty to seventy-five days prior to the anniversary date of the signing of the letter of assent.

operative date for termination is whichever occurs first in the calendar year.[13]

Even were the court to accept Bar-Con's contention that the termination date of the letter of assent is ambiguous, the result would not change. The termination clauses of the letter of assent and the CBA are, in the court's opinion, susceptible of but two possible interpretations. The whichever should first occur language could refer only to whichever date occurs first in the calendar year, which the court has concluded is the only reasonable interpretation, or termination could be measured in terms of whichever date occurs first after the signing of the letter of assent by Bar-Con. In either case, the date would always be measured by the April 30 termination date of the CBA, and not by reference to the anniversary date of the signing of the letter of assent, September 15.

■ It has been held that collective bargaining agreements, particularly with respect to termination and renewal clauses, should be strictly construed. *See Kaufman & Broad Home Sys. v. International Bhd. of Firemen*, 607 F.2d 1104 (5th Cir. 1979). Accordingly, late or premature notice, not directed to the proper party or not in the proper form, is ineffective to terminate an employer's obligations under a collective bargaining agreement. *See Teamsters v. Braswell Motor Freight Lines*, 428 F.2d 1371 (5th Cir.1970). Additionally, a Union retains the right to timely notice of termination from an employer unless that right is waived. *See Ne Di Constr. Co. v. Carpenters*, 122 LRRM 1081 (1986).

Bar-Con has presented no evidence to demonstrate that it gave notice of termination to the Union at its correct address within the time allowed for termination in either the CBA or letter of assent. Absent such evidence, the court is constrained to conclude that Bar-Con remains bound to the parties' current CBA. Consequently, the court finds that Bar-Con is liable for back pay from April 15, 1985 and delinquent contributions to the funds for the period from February 1985, when Bar-Con ceased making fringe benefit contributions, to date.

■ Bar-Con has asserted a counterclaim seeking recovery from plaintiffs for the contributions which Bar-Con erroneously paid into the individual retirement accounts of its employees. Whether this relief is available depends on whether a private right of action may be implied from the ERISA section which allows an employer to seek recovery of erroneous payments from a trust fund. The relevant ERISA section, 29 U.S.C. § 1103(c)(1), provides that "the assets of an ERISA plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries...." The section further provides that,

> In case of a contribution ...
>
> (ii) made by an employer to a multiemployer plan by a mistake of fact or law ... [29 U.S.C. § 1103(c)(1) ] shall not prohibit the return of such contribution or payment to the employer within 6 months after the plan administrator determines the contribution was made by such a mistake.

29 U.S.C. § 1103(c)(2)(A)(ii).[14] The factors for determining whether a private right of action may be implied are set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975):

---

**13.** As a practical matter, this construction is the only reasonable one in light of the needs of the multiemployer bargaining unit. In order to bargain effectively, the multiemployer bargaining unit would need to know its bargaining strength, that is, how many employers it would be representing in the negotiations. If employers could withdraw from the multiemployer bargaining unit on either the termination date of the collective bargaining agreement or in relation to the anniversary date of the letter of assent, it would be impossible for AGC to know its bargaining strength prior to its annual negotiations. *Cf. Charles D. Bonanno Linen*, 454 U.S. at 412, n. 8, 102 S.Ct. at 725, n. 8.

**14.** Although ERISA allows for recovery under mistake of fact or mistake of law, the parties to the agreement are free to modify the circumstances under which a refund may be sought. *See Electricians Health, Welfare and Pension Plan v. Gulino*, 594 F.Supp. 1265, 1272 (M.D.La. 1984). In the trust agreement between AGC and the building trade unions, erroneous contributions are provided for in section 6.9: "Contributions made to the fund by any employer under a mistake of fact may be refunded to the employer within one year after the erroneous payment."

First, is the plaintiff one of the class for whose special benefit the statute was enacted, that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent either explicit or implicit to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

Fourth, is the cause of action one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law.

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

While some courts have implied a private right of action in favor of employers for return of contributions under ERISA, others have rejected such a cause of action. *Compare Award Service, Inc. v. N. Cal. Retail Clerks Unions*, 763 F.2d 1066 (9th Cir.1985), *and Teamsters Local 639 v. Cassidy Trucking, Inc.*, 646 F.2d 865 (4th Cir. 1981) (allowing private action), *with Dime Coal Company, Inc. v. Combs*, 796 F.2d 394 (11th Cir.1986), *and Teamsters Local 348 v. Kohn Beverage Co.*, 749 F.2d 315, 321 n. 6 (6th Cir.1984), *cert. denied*, 471 U.S. 1017, 105 S.Ct. 2024, 85 L.Ed.2d 305 (1985) (refusing to recognize action); *see also Crown Cork and Seal v. Teamsters Pension Fund*, 549 F.Supp. 307, 309 (E.D. Pa.1982), *aff'd mem.*, 720 F.2d 661 (3rd Cir.1983) (denial of implied right of action).

The rationales for the courts' decisions are markedly different. In *Award Service*, the Ninth Circuit applied the *Cort v. Ash* factors equally, without particular emphasis on any one factor, and concluded that a private action in favor of the employer was properly implied. The court concluded that the ERISA section in question was clearly designed for the benefit of employers, that a congressional intent to create a private remedy in favor of the employer is implicit in the language of the statute and that,

"implying a private right of action furthers the congressional scheme of permitting restitution of contributions paid by mistake when equitable factors militate in favor of such restitution." *Id.* at 1068. In order to succeed on the merits, the employer would have the burden of establishing that the equities favor restitution. *Award Service*, 763 F.2d at 1069. Similarly, the Fourth Circuit emphasized equitable considerations in determining whether or not an employer was actually entitled to recovery of erroneous payments. *See Cassidy Trucking*, 646 F.2d at 868.

This court, however, is persuaded by the reasoning of the Eleventh Circuit in *Dime Coal Company* in which the court declined to imply a private right of action in favor of a contributing employer for the return of mistaken contributions to a multiemployer benefit plan. Applying the *Cort v. Ash* factors, the court held that legislative intent is the predominant consideration, and concluded that there was "no indication in the language of the statute or in its legislative history that Congress intended or would approve of the implication of [such a] remedy." *Dime Coal Co.*, 796 F.2d at 398. Similarly, in *Crown Cork and Seal*, the court stated that the scant legislative history and the language of the statute indicated that refunds were permissive; the statute imposed no requirement on trust fund trustees to return mistaken contributions. *Crown Cork and Seal*, 549 F.Supp. at 311.

■ This court is of the opinion that, in this case, it would be inappropriate to imply a private right of action under 29 U.S.C. § 1103. ERISA contains detailed limitations and requirements as to which party to the agreement may sue for what. *See, e.g.,* 29 U.S.C. § 1132(d)(2).[15] Moreover, even under the reasoning of *Award Service* and *Cassidy Trucking*, which recognized an implied private action, Bar-Con would not be entitled to the relief it seeks, as the court is of the opinion that equitable considerations do not favor Bar-Con on this issue. By simply requesting additional information

---

**15.** This section of the statute provides "any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter." *Id.*

regarding the employee savings and retirement fund or requesting a copy of the CBA, which clearly provided that the plan was employee funded, Bar-Con could have easily avoided making erroneous contributions.

Bar-Con's personnel had information in their possession which indicated the nature of the funding for the retirement plan. Bar-Con's superintendents were responsible for hiring carpenters and handling union referrals and related paperwork, including the compilation of hours worked. This paperwork was to be given to Bar-Con's payroll department. Bar-Con's employees routinely submitted signed payroll deduction forms to their supervisors which authorized payroll deductions at the contractual rates to fund the savings and retirement accounts. These forms were supplied by Bar-Con supervisors and, once signed by employees, were returned to the supervisors on the job sites. The authorizations on their face reflect that amounts for the savings and retirement funds were to be deducted from employee paychecks. The exercise of even the slightest diligence by Bar-Con management would have revealed that to be the case. Moreover, even after discovering its mistake, Bar-Con, on April 19, 1985, informed its employees that they could retain the payments erroneously made to their individual retirement accounts.

From the foregoing, it is clear that the erroneous payments were the result of Bar-Con's own haphazard management of its business. Thus it would be inequitable to require plaintiffs to pay for Bar-Con's mistake, especially when they have not benefited from that mistake. The plaintiffs had no control over the monies in the individual accounts and Bar-Con, of its own volition and without consulting plaintiffs, told the employees they were free to withdraw the money from their individual accounts. Consequently, even were a private right of action for refund of the mistaken contribution available, Bar-Con has failed to demonstrate, based on equitable considerations, that it should recover those monies.

Accordingly, the court finds that Bar-Con has been in breach of the CBA since February of 1985. Bar-Con will be required to allow the Union to conduct an audit and accounting pursuant to section 10.66 of the CBA in order that a determination can be made as to the amount of back pay and delinquent contributions for which Bar-Con is liable. The court also finds that the Union is entitled to liquidated damages of 20% along with interest, costs and attorney fees as provided in the CBA and the trust agreement. The court enjoins Bar-Con from future breach of the CBA,[16] but denies plaintiffs' request for costs and fees resulting from the defense of Bar-Con's counterclaim.

A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

---

**16.** This injunction does not preclude Bar-Con from effectively terminating its obligations *in* *conformity* with the terms of the letter of assent and the CBA.